UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESMOND RICKS, individually;
AKILAH COBB, individually; and
DESIRE'A RICKS, individually;

      Plaintiffs,

                    No. 17-cv-12784

-v-                    Hon. Paul D. Borman

DAVID PAUCH, in his individual capacity;
and DONALD STAWIASZ, in his
individual capacity; ROBERT B. WILSON,
in his individual capacity; and CITY OF
DETROIT, a municipal corporation;

      Defendants.

_____

## **<u>FIRST AMENDED COMPLAINT</u>**

NOW COME the Plaintiffs, DESMOND RICKS, individually, AKILAH

COBB, individually, and DESIRE'A RICKS, individually, by and through

their attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and file

their Complaint against the Defendants in this civil action, stating unto this

Court as follows:

1.     This is an action for damages brought pursuant to 42 U.S.C.

§§1983 and 1998, the Fourth, Fifth, Sixth and Fourteenth Amendments to

the United States Constitution against Defendants, DAVID PAUCH, in his

individual capacity, DONALD STAWIASZ, in his individual capacity,

ROBERT B. WILSON, in his individual capacity, and CITY OF DETROIT, a municipal corporation.

2.      Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3.      Forum is proper based on the situs of the incident, which occurred in the CITY OF DETROIT.

4.      At all pertinent times Plaintiffs, DESMOND RICKS, AKILAH COBB, and DESIRE'A RICKS, were United States citizens.

5.      At all pertinent times, Defendant, DONALD STAWIASZ ("STAWIASZ"), was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of the CITY OF DETROIT ("DETROIT") and was acting under color of law.

6.      At all pertinent times, Defendant, DAVID PAUCH ("PAUCH"), was employed as a police officer and Evidence Technician for the DPD and was acting under color of law.

7.      At all pertinent times, Defendant, ROBERT B. WILSON ("WILSON"), was employed as a police officer and Evidence Technician for the DPD and was acting under color of law.

8. At all pertinent times, DETROIT was a municipal corporation formed under the laws of the State of Michigan and was the employer of STAWIASZ and PAUCH.

**GENERAL ALLEGATIONS**

9. On March 3, 1992, at approximately 4:45 p.m., Gerry Bennett was shot to death in the parking lot of a Top Hat restaurant located at 16101 James Couzens, in the City of Detroit.

10. On that occasion, Plaintiff, a friend of Mr. Bennett, accompanied Bennett to the Top Hat restaurant in a red Ford Escort. Bennett, the driver of the Escort, parked the vehicle. Soon, a yellow Chevrolet Monte Carlo pulled up next to the Escort. Bennett got out of the Escort, while a light-skinned black man of medium height got out of the back seat of the Monte Carlo and entered the restaurant with Bennett. Plaintiff remained in the front passenger seat of the Escort.

11. When the two men left the restaurant about five to 10 minutes later, Plaintiff saw the light-skinned man point a chrome handgun at Bennett and shoot him in the stomach. Plaintiff got out of the Escort to confront the man. As he did, he saw the other man shoot Bennett in the head, then turn to shoot at Plaintiff.

12. Plaintiff turned and ran, shedding his winter coat to avoid it being caught in bushes as he ran through bushes into an adjacent neighborhood. The coat was later found by DPD officers. It contained his visitor's pass to Hutzel Hospital, where his girlfriend had just given birth to his baby daughter, Desire'a. The jacket also contained a phone book and a picture of his newborn baby.

13. An eyewitness at the scene, Arlene Strong, who was working as a cashier at the restaurant, gave a statement to police on the date of the murder. She stated that the shooter was an occupant of the yellow car. She described a *"big silver gun"* and described the shooter as *"bright complexion, medium height."*

14. Desmond Ricks is dark-skinned and stands 6'3"; in no way can he be described as *"bright complexion, medium height."*

15. The initial police report from the murder, authored by Officer R. Turner, described Ms. Strong as *"[o]ne of the best witnesses."*

16. Ms. Strong was the only eyewitness at the scene who provided a physical description of the shooter. Her description did not match Desmond Ricks.

17. On or about March 4, 1992, Defendant, STAWIASZ, was assigned as Officer-in-Charge ("OIC") of the homicide investigation.

18. On March 4, an autopsy was performed on Bennett's body. The Medical Examiner, Dr. Sawait Kanluen, retrieved one bullet from Bennett's brain, where it lodged after penetrating his skull. A second bullet was lodged in Bennett's spine.

19. On March 5, 1992, at approximately 4:00 p.m., Detroit Police Officer, James Fleming, acting on orders from DPD Sgt. Robert Gerds, and accompanied by federal A.T.F. agent, Anthony Primak, and Deputy U.S. Marshal, John Reghi, arrived at Plaintiff's mother's house at 16500 Hubbell Street in Detroit. Fleming later testified that Mary Ricks, Plaintiff's mother, was working in her garden in the front yard when they arrived.

20. Fleming also testified that the officers saw Plaintiff standing inside the doorway of the front door. He was arrested inside his home.

21. The officers did not have an arrest warrant, or consent to enter, or exigent circumstances, or probable cause, to arrest Plaintiff inside his home. It was an illegal, unconstitutional arrest.

22. Before Plaintiff was removed from the house, Mary Ricks allegedly told the officers that her son didn't shoot anybody, as he didn't even own a gun. She also stated that she was the only one in the house who owned a gun, which was a pistol she kept under her pillow, and that her son, Desmond, had <u>never</u> fired the gun.

23. Mrs. Ricks allowed the officers to take her handgun, a Rossi .38 Special, 5-shot revolver, serial #: D373334.

24. As the agents left the house, Plaintiff heard one agent, Primak, tell Fleming, *"This gun hasn't been fired."* Fleming responded, *"Take it anyway."*

25. The .38 Special caliber revolver was given to Fleming to take to the DPD.

26. Plaintiff was arrested before Mary Ricks' handgun was recovered and tested to compare the slugs removed from the victim's body to bullets test-fired from the handgun.

27. At the time of Desmond Ricks' arrest, there were no witnesses who identified Plaintiff as the shooter and no physical evidence linking him to the crime. The DPD had no evidence upon which to base probable cause for an arrest. The only evidence the police had was Plaintiff's mere presence at the murder scene.

28. Long before March 3, 1992, it was clearly established under Michigan and federal law that an individual's mere presence at a crime scene was insufficient, without more, to establish probable cause for an arrest. *People v. Olszewski*, 119 Mich.App. 455, 459; 326 N.W.2d 394 (1982); *Harris v. Bornhorst,* 513 F.3d 503, 515 (6th Cir. 2008), *cert. denied*,

554 U.S. 903; 128 S.Ct. 2938; 171 L.Ed.2d 865 (2008) ("[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest").

29.   On March 6, 1992, one day after Plaintiff was illegally arrested, Defendant, STAWIASZ, requested that firearms identification testing be conducted on the Rossi handgun taken from Ricks' home, to compare bullets to the slugs removed from Gerry Bennett's body.  STAWIASZ brought the handgun to Defendants, PAUCH and WILSON, firearm and tool-mark experts in the DPD Crime Lab.  PAUCH and WILSON had previously received the slugs from the victim's body.

30.   PAUCH, WILSON, and STAWIASZ, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

31.   PAUCH and WILSON, with STAWIASZ present, test-fired bullets from the Rossi handgun and compared them to bullets removed from Bennett's body.

32. A fundamental part of firearms identification, known to every competent (and even incompetent) firearms examiner, including PAUCH and WILSON, is the classification of bullets and guns by the number of lands and grooves in the barrel of a gun, and the direction of twist of the lands and grooves.

33. In firearms, rifling consists of helical grooves on the inside surface of a gun's barrel, which impart a spin to a bullet around its longitudinal axis. This spin serves to gyroscopically stabilize the bullet, improving its aerodynamic stability and accuracy.

34. A manufacturer's gun barrel can have any number of lands and grooves. The diameter of a barrel is measured between the distance of the lands, or raised surfaces, on the inside of the barrel.



**6-R**
**Inside surface of a gun barrel showing lands and grooves.**

35. As a bullet passes through the barrel of a gun, the bullet surface, which consists of a softer metal than the barrel, is scored by the lands in the barrel, which make the grooves in the bullet, allowing for a stable flight, much like the spin on a football.

36. The lands and grooves in the barrel are directional, meaning that the bullet will spin clockwise or counterclockwise. This is designated as the direction of the twist ("Right-hand twist" or "Left-hand twist").

37. Competent firearms examiners, such as PAUCH and WILSON, can microscopically determine the number of lands and grooves and the direction of twist of the firearm or bullet. These are known as class characteristics and can help determine whether a certain bullet was fired from a specific gun.

38. PAUCH and WILSON's report noted that the Rossi .38 Special caliber revolver was classified as "6-R," so PAUCH and WILSON clearly knew the significance of such classifications.

39. The "6" designation means that the barrel of the Rossi handgun would cut six grooves (and corresponding lands (identifying features)) into the surface of the bullet, while the "R" designation signifies a "right-hand" rotation of the bullet as it passes through the barrel.

40.     PAUCH and WILSON's examination revealed that one of the two slugs removed from the victim's body, bullet #2 removed from the spine (Evid. Tag # 923410), clearly was a "5-R" classification, meaning that it had five lands and grooves with a right-hand twist.

41.     Based on their independent examinations, PAUCH and WILSON, well-trained, competent firearm and tool-mark examiners who had testified as expert witnesses on numerous occasions, knew to a certainty that the 5-R bullet recovered from Gerry Bennett's body could not have come from the 6R Rossi .38 Special caliber revolver.

42.     Knowing the bullets did not match the suspect's gun, and that the description of the shooter by the only eyewitness did not describe Plaintiff, PAUCH, WILSON and STAWIASZ conspired and agreed to commit the overt act of falsifying the firearms identification test results to indicate a *"Positive ID"* (match) between the evidence bullets and the Rossi .38 Special caliber revolver removed from Plaintiff's home.

43.     The fabricated *"Positive ID"* lab report provided the only link between Desmond Ricks and the murder of Gerry Bennett, as there was no physical evidence or eyewitness identification linking him to the crime.

44.     PAUCH, WILSON, and STAWIASZ, all experienced, well-trained police officers who took an oath to protect citizens' constitutional

rights, conspired to knowingly deprive Desmond Ricks of his constitutional rights under the 4th Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation …."

45.     PAUCH, WILSON, and STAWIASZ knew their decision to fabricate the firearms lab report ran afoul of the United State Supreme Court's recognition of the *"fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." In re Winship*, 397 U.S. 358, 372; 90 S.Ct. 1068, 1077; 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). See also T. Starkie, Evidence 956 (1824) *("The maxim of the law is . . . that it is better that ninety-nine . . . offenders should escape, than one innocent man should be condemned")*.

46.     PAUCH and WILSON also made a deliberate, knowing, and intentional choice not to identify the number of grooves and lands, or the orientation of rotation, on either of the two slugs removed from the victim's body.  Instead, the report simply stated that the slugs demonstrated *"[t]races of lands and grooves,"* even though the lands and grooves,

especially on bullet #2 (ET# 923410) were clearly able to be measured. **(Lab Report, 3-6-92, Exhibit 1).**

47. Despite knowing that the bullets did not match the weapon, the PAUCH and WILSON report declared that a comparison of the bullets removed from Bennett's body to the Rossi handgun *"yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon." Id.* PAUCH would later testify at trial that *"It leaves the same marks such as fingerprints would leave to that gun."* TT, 9-21-92, p. 52. PAUCH would further testify to his degree of certainty in his conclusion, *"Positive identification. These bullets were fired from this weapon and no other weapon." Id.*

48. In fact, as later established by the Michigan State Police firearms expert, D/Sgt. Dean Molnar, Jr., in April and May of 2017, the slug removed from the head wound (Slug #1) was too mangled to identify any number of lands and grooves. However, the report stated that the other slug, removed from the back wound (Slug #2), *"is consistent with being a .38/9mm caliber class fired lead bullet displaying conventional rifling specifications of five lands and grooves with a right twist."* **(MSP report, 5-24-17, Exhibit 2).**

49. A "6-R" gun <u>cannot</u> make a "5-R" identification in the bullet.

50.     PAUCH and WILSON, competent, well-trained evidence technicians who had testified as firearms identification experts on numerous prior occasions, knew long before March 6, 1992, that a "5-R" bullet cannot come from a "6-R" handgun.

51.     Every expert in this case who has examined the subject bullets, including Defendants' own retained expert, Jay Jarvis, a retired firearms identification expert from the Georgia Bureau of Investigations, has concluded that the subject bullets are classified as "5R*." "Based on data in the 2010 version of the General Rifling Characteristics File published by the FBI Laboratory and the undersigned's previous experience, the rifling characteristics of five lands and grooves with a right twist exhibit on the item 1 and 2 bullets are commonly found in Smith & Wesson, Ruger and Taurus .38 Special and .357 Magnum revolvers."* **(Jarvis report, 11-30-17, Exhibit 3)**.

52.     Neither the slugs removed from Bennett's body, nor photographs of the slugs, were provided to the prosecutor.

53.     Based on the results of several Freedom of Information Act requests to the DPD, it is believed that PAUCH and WILSON did not take any photographs of the evidence bullets from the victim's body, or any

comparison photographs to document that the evidence bullets and the test-fired bullets matched like "fingerprints."

54. On March 6, 1992, PAUCH and WILSON made a deliberate, knowing, and intentional and/or reckless choice not to photograph the slugs from the victim's body.

55. On March 6, 1992, STAWIASZ made a conscious, knowing, and intentional and/or reckless choice not to request or require photographs of the fired slugs.

56. Had the slugs been provided to the prosecutor, Kenneth Simon, before trial, Simon would have had a constitutional "*Brady*" obligation to provide them to the defense, as they clearly impeached PAUCH's conclusion that the slugs were a perfect match to Ricks' gun, and were exculpatory evidence, <u>because the slugs did not match Ricks' revolver</u>.

57. Neither PAUCH nor STAWIASZ told the prosecutor that the slugs from the victim's body did not match the Rossi .38 Special caliber revolver retrieved from Plaintiff's mother.

58. Had the true test results (that the slugs did not match the alleged murder weapon) been provided to the prosecutor before trial, he would have had a constitutional "*Brady*" obligation to provide them to the defense, as they clearly impeached PAUCH and WILSON's conclusion that

14

the slugs were a perfect match to Ricks' gun, and were exculpatory evidence, <u>because the slugs did not match Ricks' handgun</u>.

59. Had PAUCH and STAWIASZ told the prosecutor before trial that they had fabricated the lab report results, he would have had a constitutional "*Brady*" obligation to provide that evidence to the defense, as it clearly impeached PAUCH's conclusion that the slugs were a perfect match to Ricks' gun, and were exculpatory evidence, <u>because the slugs did not match Ricks' handgun</u>.

60. Since PAUCH, WILSON, and STAWIASZ knew that the slugs did not match the Rossi .38 Special caliber revolver removed from Desmond Ricks' mother's house, STAWIASZ, as Officer-in-Charge, made a conscious, knowing, and intentional and/or reckless choice <u>not</u> to request a fingerprint examination of the handgun to check for a match with Desmond Ricks, despite having requested a fingerprint test of the victim's cell phone and automobile.

61. On March 6, 1992, one day after his arrest, Plaintiff was interviewed by STAWIASZ and Investigator, Richard Ivy. Plaintiff explained what had occurred at the Top Hat restaurant and that he did not shoot Gerry Bennett, to which STAWIASZ responded, *"We know you didn't; but*

*you know who did, and you'll be the one going to prison if you don't tell us."* After that, Plaintiff refused to speak to STAWIASZ any further.

62. Later that morning, STAWIASZ informed Plaintiff that the bullets from the victim's body matched the Rossi .38 Special caliber revolver taken from Plaintiff's mother's bedroom.

63. On March 6, 1992, a witness on the scene, Howard Dillworth, was asked to view a live lineup with Desmond Ricks in the lineup. Mr. Dillworth did not identify Mr. Ricks as the shooter. STAWIASZ supervised the live lineup.

64. On March 11, 1992, another witness on the scene, Ollie McAdoo, was asked to view a live lineup with Desmond Ricks in the lineup. Mr. McAdoo did not identify Mr. Ricks as the shooter. STAWIASZ supervised the live lineup.

65. Despite police reports describing Arlene Strong as "one of the best witnesses" in the case, and Ms. Strong having previously described the shooter as *"bright complexion, medium height,"* STAWIASZ made a conscious, knowing, and intentional and/or reckless choice not to have Arlene Strong view a live lineup.

66. On July 15, 1992, the trial court ordered the physical evidence, including the slugs and handgun, to be examined by retired Michigan State

Police D/Lt., David Townshend. The examination was to be conducted at the Detroit Police Department.

67. Inexplicably, a subsequent order, dated August 6, 1992, was entered, allowing Defendant, STAWIASZ, to transport the evidence to Townshend's lab in Mason, Michigan, instead of testing being conducted at the DPD lab.

68. In furtherance of the decision to frame Desmond Ricks for murder, STAWIASZ switched the slugs taken from Gerry Bennett's body with the test-fired bullets from the Rossi .38 Special caliber revolver and marked the test-fired bullets as Evidence Tags 923409 and 923410. STAWIASZ then transported the evidence to Townshend's office for testing on August 16, 1992.

69. After viewing the evidence bullets, Townshend, an experienced firearms examiner, was concerned that the two bullets represented to be from the victim's body were not from the victim at all, because their condition was "too pristine" and they were not damaged, as he would have expected. STAWIASZ, however, assured Townshend that the bullets provided to him were, in fact, from the victim's body.

70. Relying on STAWIASZ's integrity and ethics, David Townshend, with STAWIASZ present, microscopically examined the

evidence and compared the bullets presented by STAWIASZ to bullets Townshend test-fired from the Rossi handgun. Townshend concluded that the bullets represented by STAWIASZ to have come from the victim's body matched the Rossi .38 Special caliber revolver.

71.     STAWIASZ knew they would match, since he supplied Townshend with the fabricated evidence (previously test-fired bullets from the Rossi handgun) and told Townshend that they were from the victim's body!

72.     The firearms identification evidence was the centerpiece of the State's case, since no eyewitness testified that Plaintiff shot Gerry Bennett. The prosecutor stressed the physical evidence in his closing:

> This case, ladies and gentlemen, comes down to really one thing, one piece of evidence, and that is this gun here.  Because this is the one . . . inescapable fact of this case is that this gun is the weapon that killed Gerry Bennett.  And this gun . . . was found at the defendant's house.  That's the one inescapable fact.  No matter how the defendant tries to escape it, he can't.  This gun that killed Gerry Bennett was found at his house.
> TT, 9-23-92, p. 107.

73.     The prosecutor continued to emphasize Pauch's testimony:

> You heard Officer Pauch say the nature of this evidence is about like a fingerprint.  He has never seen – Officer Pouch (sic) has never seen a gun or two different guns that fired the same bullet the same way such as they would be misidentified.  That just does not happen.  This is the nature of fingerprint evidence.  You can always tell when slugs were fired from a certain gun.  It is that certain.  And Officer Pouch (sic) told you he was certain.

*Id.* at 109.

74.    PAUCH and WILSON's doctored test results were so important to prosecutor, Kenneth Simon's, case, that Simon mentioned the phrases "*inescapable fact*" and "*can't escape the fact*" [that Ricks' gun killed Gerry Bennett] no less than seven times during his closing argument.

75.    Based on the fabricated "scientific testing," the jury convicted Plaintiff of second-degree murder and felony firearm on September 23, 1992.

76.    But for Defendants' conduct, as set forth below, there would have been no probable cause for Plaintiff to be charged with the murder of Gerry Bennett.

77.    After 25 years of wrongful incarceration, testing by the Michigan Police Department Crime Lab in 2017 demonstrated that the bullets from Gerry Bennett's body did not match the alleged murder weapon taken from Desmond Ricks' home.

78.    On May 26, 2017, after Desmond Ricks had spent **9,214 days, or 25 years, 2 months, and 22 days**, in jail and/or prison, he was released from the Richard A. Handlon Correctional Facility in Ionia, Michigan, on the order of Wayne County Circuit Court Judge Richard Skutt.

79. On June 1, 2017, charges were dismissed by the Wayne County Prosecutor's Office and Desmond Ricks, now 51, was finally set free. **(Order of Nolle Prosequi, 6-1-17, Exhibit 4).**

80. On June 1, 2017, the Wayne County Prosecutor's Office released a statement saying *"We worked collaboratively with the University of Michigan Innocence Clinic to secure a reanalysis of the ballistic evidence in this case. The ultimate result was that we agreed to the motion requesting a new trial on May 26, 2017. After thoroughly examining the remaining evidence in the case we have concluded that we cannot proceed to trial, and today we agree that Mr. Ricks should be released."*

## DETROIT'S CUSTOMS AND POLICIES THAT LED TO PLAINTIFF'S WRONGFUL CONVICTION

81. In and before March 5, 1992, the date of Plaintiff's arrest, the City of Detroit, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate and approve illegal and unconstitutional actions by Detroit Police Department officers and command staff.

82. The illegal and unconstitutional actions and practices included but were not limited to:

    a. Conducting inadequate investigations into serious felony cases, such as murder, in order to expeditiously close

cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

b.  Knowingly and deliberately fabricating evidence in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

c.  Knowingly and deliberately choosing not to conduct formal tests and identification procedures because investigators knew that the results would contradict evidence against their target suspect.

83.  Defendant, DETROIT, through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection, analysis, and disclosure, including their duty not to fabricate evidence and to disclose apparent exculpatory and impeachment evidence.

84.  DETROIT's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Desmond Ricks, and were the moving force behind the individual Defendants' constitutional violations.

85.  Due to the conduct of Defendants, STAWIASZ, WILSON, PAUCH, and DETROIT, as set forth below, Plaintiff, DESMOND RICKS, suffered the following injuries and damages:

A.  Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over twenty-five years, including significant time spent in solitary confinement;

21

B.  Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with second-degree murder and felony-firearm, facing a sentence of 32- to 62-years in prison; and being wrongfully convicted of crimes the Defendants knew he did not commit;

C.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

D.  Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

E.  Loss of enjoyment of daily activities including, but not limited to, seeing his children grow up;

F.  Not being able to attend the funerals of family members, including his beloved mother;

G.  Physical injuries suffered in prison;

H.  Loss of employment opportunity, past income and future earning capacity;

I.  Loss of his close relationship with his minor daughters;

J.  Physical injuries while being imprisoned, including being assaulted;

K.  Loss of employment opportunity, past income and future earning capacity;

L.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity,

family relations, recreational activities, and personal expression;

M. Many of Plaintiff's injuries and damages are likely to be permanent;

N. Other damages which may be revealed through discovery.

86. Due to the conduct of Defendants, STAWIASZ, WILSON, and PAUCH, as set forth below, Plaintiff, AKILAH COBB, only seven years old when her father was arrested, suffered the loss of the parental society, companionship, guidance, and full relationship with her father.

87. Due to the conduct of Defendants, STAWIASZ, WILSON, and PAUCH, as set forth below, Plaintiff, DESIRE'A RICKS, only five days old when Plaintiff was arrested, suffered the loss of the parental society, companionship, guidance, and full relationship with her father.

88. Due to the conduct of Defendants, STAWIASZ, WILSON, and PAUCH, as set forth below, the true killer has never been caught and the victim's family has never received true closure.

## COUNT I
## CONSTITUTIONAL VIOLATIONS BY ALL DEFENDANTS

89. Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

90. Defendants, STAWIASZ and PAUCH, were under an unwavering legal duty (*"Brady"* duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, including, but not limited to, the evidence that they fabricated the test results to state that the examination *"yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon,"* when, in fact, the bullets did not match the Rossi .38 Special caliber revolver. Defendants' failure to disclose the above-referenced evidence to the prosecutor resulted in material exculpatory and impeachment evidence not being turned over to Plaintiff's defense counsel, in violation of the State's *Brady* obligations.

91. Defendant, STAWIASZ, as Officer-in-Charge, was under a further duty to make truthful statements to the prosecutor and magistrate judge to establish probable cause for an arrest warrant.

92. Defendants, PAUCH and WILSON, were under a further duty to make truthful statements in forensic reports they knew would go to the prosecutor to establish probable cause for an arrest warrant.

93. Defendants violated DESMOND RICKS' constitutionally-protected rights, including his right to liberty protected by the Due Process clause of the Fifth Amendment, as applicable to the States via the Fourteenth Amendment to the U. S. Constitution, his right to a fair trial,

guaranteed by the Sixth Amendment, as well as his right to be free from

continued unlawful detention without probable cause based on fabricated

evidence, guaranteed by the Fourth Amendment, by the following conduct:

### *Brady* Violations

Defendants, STAWIASZ and PAUCH, deliberately and knowingly, or with reckless disregard for the truth, chose not to disclose material exculpatory and impeachment evidence in their files to the prosecutor in violation of their constitutional obligation under *Brady v Maryland*, 373 US 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a "*Brady* violation" under the Fifth Amendment;

### Malicious Prosecution

Defendant, STAWIASZ, influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false evidence by switching bullets to be provided to David Townshend, and supplied false information and omitted material information which showed a reckless disregard for the truth in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause. Such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment;

Defendants, PAUCH and WILSON, influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly supplied false information (that the bullets from Gerry Bennett's body matched Ricks' gun) that was relied upon by the prosecutor in bringing criminal charges, and was material to a finding of probable cause that Plaintiff had committed the crime of murder, which otherwise would have been lacking. Such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment;

## Fabrication of Evidence

Defendants, STAWIASZ, WILSON, and PAUCH, deliberately and knowingly fabricated evidence to create probable cause, including the "positive ID," to suggest that the bullets from the victim's body had come from the handgun retrieved from Ricks' mother's house, which was material to a finding of probable cause that Plaintiff had committed the crime of murder, and would otherwise have been lacking; such conduct constituting a claim of "fabrication of evidence" under the Fourth Amendment;

Defendant, STAWIASZ further fabricated evidence, in deliberate and knowing fashion, to secure a conviction, including switching the bullets provided to expert, David Townshend, which was material to the jury's decision that Plaintiff had committed the crime of murder, and which otherwise would have been lacking; such conduct constituting a claim of "fabrication of evidence" under the Fourth Amendment;

## DETROIT's *Monell* Liability

Defendant, DETROIT, created policies, practices and customs, including a failure to provide adequate training to its police officers, including Defendants, PAUCH and STAWIASZ, in the manner set forth above, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual Defendants' violations of Plaintiff's constitutional rights.

94. Desmond Ricks' right not to be deprived of liberty based upon fabrication of evidence by a government official acting in an investigatory capacity, including a police detective and police evidence technician, was clearly established before March 5, 1992.

95. Desmond Ricks' right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before March 5, 1992.

96. Desmond Ricks' right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges, guaranteed by the Fourth Amendment, was clearly established before March 5, 1992.

97. Defendants' *Brady* violations resulted in Plaintiff not receiving a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, (1995).

98. As a direct and proximate result of the Defendants' willful violation of his constitutionally-protected rights, Plaintiff was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned for over 25 years, and deprived of his liberty, causing him to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff, DESMOND RICKS, prays for compensatory damages in a minimum amount of Fifty Million Dollars ($50,000,000.00). Plaintiff further seeks punitive damages pursuant to 42 U.S.C. §1983 as to Defendants, PAUCH and STAWIASZ, in a minimum amount of Twenty-

Five Million Dollars ($25,000,000.00) against each Defendant, together with interest, costs, attorney fees, and other such relief as the Court deems appropriate.

## COUNT II
## <u>COMMON LAW MALICIOUS PROSECUTION BY  DEFENDANTS, DONALD STAWIASZ, ROBERT B. WILSON, AND DAVID PAUCH</u>

99.    Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

100.   Defendant, STAWIASZ, initiated criminal prosecution against Plaintiff in state court by submitting a Warrant Request and swore to false facts in support of an arrest warrant.

101.   The criminal proceedings ultimately terminated in Plaintiff's favor with a dismissal of the charges in state court on June 1, 2017.

102.   STAWIASZ initiated the prosecution by deliberately stating false and misleading facts in his Request for Warrant, which were relied upon by the Wayne County Prosecutor's Office.  STAWIASZ acted maliciously and/or with a wanton or reckless disregard for Plaintiff's rights, by deliberately fabricating evidence (the "bullet evidence") to suggest that the handgun retrieved from Plaintiff's mother's house was the same weapon used in the murder of Gerry Bennett.  Thus, STAWIASZ did not act with good faith.

103. PAUCH and WILSON also initiated the prosecution by deliberately stating false and misleading opinions in their March 6, 1992, lab report, which were relied upon by the Wayne County Prosecutor's Office. PAUCH and WILSON acted maliciously and/or with a wanton or reckless disregard for Plaintiff's rights, by deliberately fabricating evidence (the "bullet evidence") to suggest that the handgun retrieved from Plaintiff's mother's house was the same weapon used in the murder of Gerry Bennett. Thus, PAUCH and WILSON did not act with good faith.

104. The prosecution was undertaken without probable cause, with malice, and for the purpose of framing Plaintiff for the murder and covering up an illegal arrest, not with the intention of bringing Plaintiff to justice for having committed the alleged murder.

105. The prosecution was undertaken to justify and cover up an illegal, warrantless arrest, and to counter the DPD's abysmal and long-standing record and reputation for failing to solve homicides.

106. As a direct and proximate result of Defendants' malicious conduct, Plaintiff, DESMOND RICKS, was charged with crimes he did not commit, causing him to suffer the injuries and damages set forth above.

107.  As a direct and proximate result of Defendants' malicious prosecution, Plaintiffs, AKILAH COBB and DESIRE'A RICKS, suffered the injuries and damages set forth above.

108.  Defendants' conduct was malicious and so willful and wanton as to demonstrate a reckless disregard of Plaintiffs' rights, and would readily inspire feelings of humiliation, outrage and indignity, such as would warrant exemplary damages.

WHEREFORE, Plaintiff, DESMOND RICKS, prays for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of Fifty Million Dollars ($50,000,000.00), together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

WHEREFORE, Plaintiffs, AKILAH COBB and DESIRE'A RICKS, pray for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of Twelve and One Half Million Dollars ($12,500,000.00) for each Plaintiff, together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

## COUNT III
## COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY DEFENDANTS, DONALD STAWIASZ, ROBERT B. WILSON, AND DAVID PAUCH

109. Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

110. Defendants, STAWIASZ, WILSON, and PAUCH, by their extreme and outrageous conduct, described above, demonstrated such intent and/or recklessness as to cause Plaintiff, Desmond Ricks, severe emotional distress.

111. Defendants' conduct can only be described as atrocious, outrageous, and utterly intolerable in a civilized society.

112. Defendants' conduct meets the elements of the common law claim for Intentional Infliction of Emotional Distress.

WHEREFORE, Plaintiff, DESMOND RICKS, prays for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of Fifty Million Dollars ($50,000,000.00), together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

WHEREFORE, Plaintiffs, AKILAH COBB and DESIRE'A RICKS, pray for such compensatory and exemplary damages as are available pursuant to the common-law of the State of Michigan, in a minimum amount of

Twelve and One Half Million Dollars ($12,500,000.00) for each Plaintiff,

together with pre-judgment interest, costs and attorney fees in an amount

to be determined by the Court.

MUELLER LAW FIRM

s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
Attorneys for Plaintiffs
34405 W. Twelve Mile Rd., Ste. 200A
Farmington Hills, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com

Dated: May 18, 2018

## RELIANCE ON JURY DEMAND

Plaintiffs, by and through their attorneys, MUELLER LAW FIRM, rely on their previously filed jury demand in this matter.

MUELLER LAW FIRM

s/Wolfgang Mueller
WOLFGANG MUELLER (P43728)
Attorneys for Plaintiff
34405 W. Twelve Mile Rd., Ste. 200A
Farmington Hills, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com

Dated: May 18, 2018

---

### CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2017, I electronically filed First Amended Complaint with the Clerk of the Court using the ECF system which will send notification of such filing to the following:   Jerry Ashford, Esq. and Jacob Satin, Esq.

I further hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  None.

s/Wolfgang Mueller
MUELLER LAW FIRM
34405 W. Twelve Mile Rd., Ste. 200A
Farmington Hills, MI 48331
248-489-9653
wolf@wolfmuellerlaw.com
(P43728)