UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESMOND RICKS, AKILAH COBB,
and DESIRE'A RICKS,                          Case No. 17-cv-12784

                    Plaintiffs,              Paul D. Borman
                                             United States District Judge
v.
                                             R. Steven Whalen
DAVID PAUCH, in his individual               United States Magistrate Judge
capacity, DONALD STAWIASZ,
in his individual capacity, and
CITY OF DETROIT, a Municipal
Corporation,

                    Defendants.
_____/

OPINION AND ORDER DENYING DEFENDANTS' MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS (ECF NO. 14)

        Plaintiff Desmond Ricks was released from prison in 2017 after serving 25

years on a wrongful conviction for murder.  Mr. Ricks and his two adult daughters

have filed this suit under 42 U.S.C. § 1983 against the City of Detroit and two City

of Detroit police officers alleging violations of his constitutional rights based upon

alleged fabrication and withholding of evidence.  Defendants now move for partial

judgment on the pleadings, arguing that a police officer's "*Brady*-derived"[1] obligation

---

[1] The constitutional violation alleged by Plaintiffs at issue in this motion is an alleged
deprivation of due process based upon the failure of the state to turn over

1

to disclose exculpatory evidence to a prosecutor was not clearly established in 1992 when Desmond Ricks was investigated, indicted, and tried and that even if the law was clearly established, Plaintiffs have failed to allege a plausible *Brady*-derived claim of withholding of evidence. The matter has been fully briefed and the Court held a hearing on March 14, 2018. For the reasons that follow, the Court DENIES the motion.

## I. FACTUAL BACKGROUND

According to the allegations of Plaintiffs' Complaint, which the Court must accept as true for purposes of resolving this motion for judgment on the pleadings, on March 3, 1992, at approximately 4:45 p.m., Gerry Bennett was shot to death in the parking lot of a Top Hat restaurant located at 16101 James Couzens, in the City of Detroit. (Compl. ¶ 8.) Plaintiff Desmond Ricks, a friend of Bennett, accompanied Bennett to the Top Hat restaurant in a red Ford Escort, driven by Bennett. Soon a yellow Chevrolet Monte Carlo pulled up next to the Escort and Bennett got out of the Escort and entered the restaurant with a light-skinned black man of medium height

---

exculpatory/impeaching evidence as constitutionally required. This civil cause of action derives from *Brady v. Maryland*, 373 U.S. 83 (1963), which imposed an obligation on prosecutors to disclose all materially favorable evidence in the State's possession to the defense. The *Brady*-derived obligation at issue in this case, as discussed *infra*, imposes a duty on police officers (among others) to disclose exculpatory/impeaching evidence to prosecutors. *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).

who got out of the back seat of the Monte Carlo. When the two men left the restaurant about five to ten minutes later, Ricks saw the light-skinned black man point a chrome handgun at Bennett and shoot him in the stomach. Ricks got out of the Escort to confront the man and saw the other man shoot Bennett in the head, then turn to shoot Ricks. (*Id.* ¶¶ 9-10.) Ricks turned and ran, shedding his winter coat to avoid being caught in bushes as he ran into an adjacent neighborhood. The coat was later found by Detroit Police Department ("DPD") officers, with Ricks's visitor's pass to Hutzel Hospital in the jacket pocket, where his wife had just given birth to their daughter Desire'a. The coat also contained a phone book and a picture of his newborn baby. An eyewitness at the scene, Arlene Strong, who was working as a cashier at the Top Hat restaurant at the time of the shooting, gave a statement to police on the date of the murder. She stated that the shooter was an occupant of the yellow car, with a bright complexion and of medium height, and she described a big silver gun. Ricks is a 6'3" dark skinned black male. Mrs. Strong was the only eyewitness at the scene who provided a physical description of the shooter. She was described by officers as "one of the best witnesses." (*Id.* ¶¶ 10-13.)

On or about March 4, 1992, Defendant Stawiasz was assigned as the officer-in-charge ("OIC") of the homicide investigation. On March 4, 1992, an autopsy was performed on Bennett and the medical examiner, Dr. Sawait Kanluen, retrieved one

bullet from Bennet's brain and a second from Bennett's spine. On March 5, 1992, Detroit Police Officers and a federal ATF agent, none of whom are Defendants in this case, arrived at Ricks's mother's house at 16500 Hubbell Street in Detroit and arrested Ricks inside the home without an arrest warrant or consent to enter. Before Ricks left the house, it is alleged that his mother told the officers that her son didn't shoot anybody as he didn't own a gun. She revealed that she owned a gun and that her son had never fired her gun. Mrs. Ricks allowed officers to take her handgun, a Rossi .38 Special, 5-shot revolver, serial # D373334. (*Id.* ¶¶ 16-22.)

On March 6, 1992, one day after Ricks was arrested, Stawiasz requested that firearms testing be conducted on the Rossi handgun taken from Ricks' home, to compare bullets to the slugs removed from Gerry Bennett's body. Stawiasz brought the handgun to Defendant Pauch, a firearm and tool-mark expert in the DPD crime lab. Pauch had previously received the slugs from the victim's body. Pauch and Stawiasz were both sworn Detroit police officers. Pauch, with Stawiasz present, test-fired bullets from the Rossi handgun and compared them to the bullets removed from Bennett's body. Bullets and guns are classified by the number of lands and grooves of a gun and the direction of twist (right-hand or left-hand) of the barrel. By examining the lands and grooves and the direction of twist of a firearm or bullet, these "class characteristics" can help to determine whether a certain bullet was fired from

a certain gun.  (*Id.* ¶¶ 28-36.)

Pauch's report noted that the Rossi .38 (Ricks's mother's gun) was classified as a "6-R", which means that the barrel of the Rossi gun would cut six grooves (and corresponding lands) into the surface of a bullet, while the "R" designation signifies a right-hand rotation.  Pauch's examination revealed that one of the two slugs removed from Bennett's body, bullet #2 from the spine (Evidence Tag #923410), clearly was a "5-R" classification, meaning that it had five lands and grooves with a right-hand twist.  Bullet #1, which was removed from Bennett's skull (Evidence Tag #923409), was too badly deformed to make any type of class identification.  Pauch knew that a the "5-R" bullet recovered from Bennett's body could not have been fired from the "6-R" Rossi.  (*Id.* ¶¶ 37-41.)

Knowing that the bullets recovered from Bennett's body did not match the Rossi, the alleged murder weapon, Pauch and Stawiasz conspired and agreed to commit the overt act of falsifying the firearms identification test results to indicate a "Positive ID" (match) between the "evidence" bullets (those test-fired from the Rossi gun) and the Rossi gun removed from Ricks's home.  This fabricated report was the only evidence linking Ricks to the murder of Gary Bennett, as there was no physical evidence or eyewitness identification linking Ricks to the murder.  (*Id.* ¶¶ 42-43.)  A "6-R" gun cannot make a "5-R" identification in a bullet.  (*Id.* ¶ 49.)

Neither of the slugs removed from Bennett's body, nor photographs of the slugs, were provided to the prosecutor on Ricks' case. (*Id*. ¶¶ 51-52.) Neither Pauch nor Stawiasz told the prosecutor that the slugs from the victim's body did not match the Rossi revolver retrieved from Ricks's mother's house. The true test results would have provided both exculpatory and impeachment evidence material to Ricks's case. (*Id*. ¶ 57-59.)

On March 6, 1992, the day after his arrest, Ricks was interviewed by Stawiasz and Investigator Richard Ivy. Ricks explained what occurred at the Top Hat restaurant and stated that he did not shoot Gerry Bennett, to which Stawiasz stated: "We know you didn't; but you know who did, and you'll be the one going to prison if you don't tell us." Ricks then refused to speak further with Stawiasz. Later that morning, Ricks was informed that the bullets from the victim's body matched the Rossi .38 taken from his mother's bedroom. (*Id.* ¶¶ 60-61.)

On July 15, 1992, the trial court ordered the physical evidence, including the slugs removed from Bennett's body and the handgun, to be examined by retired Michigan State Police evidence technician David Townshend. The examination was originally scheduled to take place at the DPD lab but was later ordered by the trial court to take place at Townshend's lab in Mason, Michigan. Stawiasz switched the slugs taken from Bennett's body with the test-fired bullets from the Rossi and marked

the test-fired bullets as Evidence Tags 923409 and 923410, and transported them to Townshend's office for testing on August 16, 1992. (*Id.* ¶¶ 65-67.)

Townshend was concerned that the two bullets he was given to examine were "too pristine" to have been recovered from the victim's body but when he questioned Stawiasz on this Stawiasz assured Townshend that the bullets provided to him were in fact from the victim's body. Relying on Stawiasz's integrity and ethics, Townshend conducted the test and concluded that the bullets represented by Stawiasz to have come from the victim's body matched the Rossi revolver. The firearms identification evidence was the centerpiece of the State's case against Ricks and the prosecutor stressed this evidence in his closing argument and during the trial and vouched for the credibility of Pauch's testimony at trial that the match between the bullets and the Rossi were certain. (*Id.* ¶¶ 71-73.)

A jury convicted Ricks of second-degree murder and felony firearm on September 23, 1992. After 25 years of incarceration, testing by the Michigan Police Department Crime Lab in 2017 demonstrated that the bullets from Gerry Bennett's body did not match the alleged murder weapon taken from Ricks' home. On May 26, 2017, Ricks was released from prison on the Order of Wayne County Circuit Court Judge Richard Skutt, having spent 25 years, 2 months, and 22 days in prison. On June 1, 2017, the Wayne County Prosecutor's Office dismissed the charges against Ricks.

Plaintiffs further allege that the City of Detroit, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve unconstitutional conduct by its officers, including (1) conducting inadequate investigations into serious felony cases to expeditiously close cases, (2) knowingly and deliberately fabricating evidence in order to manufacture probable cause and/or strengthen a case for conviction; and (3) knowingly and deliberately choosing not to conduct formal tests and identification procedures in order to avoid obtaining evidence that would contradict evidence against their target suspect. (*Id.* ¶¶ 80-84.)

## II.    STANDARD OF REVIEW

"Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are analyzed under the same de novo standard as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)). "[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same . . . ." *Lindsay v. Yates*, 498 F.3d 434, 437 n. 5 (6th Cir. 2007). The Sixth Circuit has defined the pleading requirements necessary to withstand a challenge under Rule 12(c):

> We recently explained the pleading requirements that are necessary to survive a Rule 12(c) motion:

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.... Factual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 1964-65 (internal citations omitted). In *Erickson v. Pardus*, 550 U.S. ----, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), decided two weeks after *Twombly*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* at 2200 (quoting *Twombly*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (citing *Twombly*, 127 S.Ct. at 1965). We read the *Twombly* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12. *Sensations, Inc.*, 526 F.3d at 295-96 (footnote omitted).

*Tucker v. Middleburg-Legacy Place*, *LLC*, 539 F.3d 545, 550 (6th Cir. 2008) (quoting

*Sensations,* 526 F.3d at 295 (6th Cir. 2008)).

When reviewing a motion to dismiss under Rule 12(b)(6), and therefore under

Rule 12(c), a court must "'construe the complaint in the light most favorable to the

plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of

the plaintiff.'" *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal quotation marks and citations omitted). *See also Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. at 555 (internal quotation marks and citations omitted) (alteration in original). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), explaining that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id*. at 678." Thus, "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible. Bare assertions of legal liability absent some corresponding facts are insufficient to state a claim." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to

dismiss form part of the pleadings. . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings).

## III. ANALYSIS

Ricks alleges that Defendants have violated several of his constitutional rights and seeks redress under 42 U.S.C. § 1983. The only constitutional claim at issue in this motion is an alleged deprivation of due process under the Fourteenth Amendment for Pauch and Stawiasz's failure to disclose exculpatory evidence to the prosecutor. The Defendants acknowledge that the Sixth Circuit has extended the duty to disclose exculpatory evidence to police officers, as held in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009). Defendants argue, however, that the Sixth Circuit wrongly decided the "clearly established" prong of the qualified immunity analysis in *Moldowan*, and submit that it was not clearly established in 1992 that such a *Brady*-derived obligation applied to police officers and that therefore they are entitled to qualified immunity from Plaintiffs' §1983 *Brady*-derived claim.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show

that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity requires the court to determine: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (citations omitted). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id*. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236. "Each Defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

The Sixth Circuit has adopted the following well-established analysis for determining whether a right is clearly established:

For a right to be clearly established, "[t]he contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (citing *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151). Thus, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

"We look first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action complained of occurred." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citing *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993)). "[T]he case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.' " *Id.* (quoting *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997)). Plaintiffs bear the burden of showing the claimed right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

*Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012). "'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Flying Dog Brewery, LLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 353 (6th Cir. March 5, 2015) (quoting *al-*

*Kidd*, 131 S. Ct. at 2013).  The inquiry requires the Plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" to demonstrate that the right was clearly established.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (internal quotation marks and citation omitted).  *See Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013) (Observing that the clearly established inquiry requires the plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" in order to show that the right was clearly established.) (quoting *al-Kidd*, 563 U.S. at 742).

A.    **It Was Clearly Established in 1992 That Police Officers Had a "*Brady*-derived" Obligation to Disclose Exculpatory Evidence.**

Defendants argue that they were not obligated in 1992 to disclose to the prosecutor that they had fabricated evidence and possessed exculpatory and impeaching evidence favorable to the defense at the time of their investigation into Mr. Bennett's murder and Mr. Ricks's trial and conviction.  Defendants submit that they are entitled to qualified immunity for any failure to comply with any disclosure obligation because the law was not clearly established, until the Sixth Circuit decided *Moldowan* in 2009, that police officers were bound by *Brady*-derived disclosure requirements.  The fatal flaw in this argument is that the Sixth Circuit, in *Moldowan*, expressly held that there is a *Brady*-derived obligation imposed on police officers and

that this obligation was clearly established at least as early as 1990, when the *Brady*-derived failures to disclose allegedly occurred in that case:

> Moldowan's allegations, although asserted under various constitutional provisions, present claims under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The question we confront here is whether Detective Ingles' alleged suppression of Burroughs' statements violated the same "legal norm" underlying the due process violation recognized in *Brady*. We hold that it does.

>    *     *     *

> As far as the Constitution is concerned, a criminal defendant is equally deprived of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same.

>    *     *     *

> For most of the same reasons we have laid out here, virtually every other circuit has concluded either that the police share in the state's obligations under Brady, or that the Constitution imposes on the police obligations analogous to those recognized in *Brady*. *See, e.g., Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("One standard police function is to provide information to the prosecutor and the courts. Thus, a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information."); *Hart v. O'Brien*, 127 F.3d 424, 446–47 (5th Cir. 1997) ("[A] plaintiff states a section 1983 claim against a police officer who, after learning of 'patently exculpatory evidence,' deliberately fails to disclose it to the prosecutor." (citation omitted)); *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) ("Our case law clearly established that an accused's due process rights

are violated when the police conceal exculpatory or impeachment evidence.") (collecting cases); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("The police satisfy their obligations under Brady when they turn over exculpatory evidence to the prosecutors."); *Geter v. Fortenberry*, 882 F.2d 167, 171 (5th Cir. 1989) (affirming denial of qualified immunity for police officer defendant with respect to plaintiff's claim that the officer failed to disclose exculpatory evidence); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."). As this litany of cases indicates, the courts consistently have rejected the notion that the police have no role to play in carrying out the state's constitutionally-mandated obligations in this area. Although the prosecutor's office bears primary responsibility for carrying out the state's actual "disclosure" obligations under *Brady*, the police bear, as the Eighth Circuit has put it, an equally important "*Brady*-derived" responsibility to turn over potentially exculpatory evidence to the prosecutor's office. *White*, 519 F.3d at 814. Semantic quibbles aside, there is no doubt that the police are just as capable of depriving criminal defendants of a fundamentally fair trial by suppressing exculpatory evidence.

578 F.3d at 376-77, 379, 381. The Sixth Circuit then squarely held that this obligation was clearly established in 1990, when the alleged disclosure violations occurred in *Moldowan*:

Having determined that the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police, we next must determine whether that obligation was "clearly established" as of the date of Detective Ingles' alleged violation of that duty. In determining whether a right is clearly established, we "may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits." In evaluating the

relevant case law, we must determine whether the right has been recognized "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." In other words, "the unlawfulness must be apparent."

Decisions from other circuits recognizing the type of "*Brady*-derived" claims that Moldowan asserts here date back as far as 1964. In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established. Although our recognition of this type of a claim is more recent and less specific, the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights.

*Moldowan*, 578 F.3d at 381-82 (citing *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964); *Geter v. Fortenberry*, 882 F.2d 167, 171 (5th Cir. 1989); and *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988)).

Defendants argue that the clearly established aspect of *Moldowan* was wrongly decided, calling the Sixth Circuit's analysis "thin" and wrong in light of a more recent Supreme Court decision, *Ashcroft v. al-Kidd*, *supra*, in which the Supreme Court clarified the "clearly established" standard. But, as courts interpreting and applying *Moldowan* have specifically held, any gloss or clarification on the clearly established standard offered by *al-Kidd* and its progeny does not change the analysis and result in *Moldowan*.

The Sixth Circuit's discussion of the clearly established issue in *Moldowan* was not "thin" as Defendants suggest. The Sixth Circuit steered clear of defining the right at too "high a level of generality," as the Supreme Court later demanded in *al-Kidd*, and expressly recognized that the right at issue must be evaluated in a "more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Moldowan*, 578 F.3d at 382. The Sixth Circuit relied on three published circuit decisions recognizing *Brady*-derived claims prior to 1990: *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964); *Geter v. Fortenberry*, 882 F.2d 167, 171 (5th Cir. 1989); and *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988), and discussed those cases at length. 578 F.3d at 381-82. As the Supreme Court instructed in *al-Kidd*, it is appropriate to search for clearly established law outside of the Supreme Court and controlling circuit, but in doing so the court must identify "a robust consensus of cases of persuasive authority." *al-Kidd*, 563 U.S. at 742. This is exactly what the Sixth Circuit did in *Moldowan*.

In *Virgil v. City of Newport*, No. 16-224, 2018 WL 344986 (E.D. Ky. Jan. 9, 2018), a case involving police officers' alleged withholding of evidence that occurred in 1988, the district court adopted *Moldowan's* clearly established holding, and expressly considered the validity of that holding in light of the clarifying standards set

19

forth in *al-Kidd* and its progeny. As the district court noted in *Virgil*, it is well established in the Sixth Circuit that "persuasive authority from 'other circuits that is directly on point' may also demonstrate that a law is clearly established." 2018 WL 344986, at *7 (quoting *Occupy Nashville v. Haslam*, 769 F.3d 434, 443 (6th Cir. 2014)). This is exactly what the Sixth Circuit did in *Moldowan* – it collected a robust consensus of Circuit Court cases directly on point. And, as the district court observed in *Virgil*, "[a]lthough the *Moldowan* Court primarily relied on three cases from the Fourth, Fifth and Seventh Circuits to establish that police officers' duties under *Brady* were clearly established, the Eighth and Ninth Circuits had also extended *Brady* obligations to police officers prior to 1988." 2018 WL 344986, at *8 (citing *Walker v. Lockhart*, 763 F.2d 942, 958 (8th Cir. 1985) and *United States v. Butler*, 567 F.2d 885, 891 (9th Cir. 1978)). "Therefore, by September 1988, the Fourth, Fifth, Seventh, Eighth, and Ninth Circuits had all held that police officers had a duty to disclose exculpatory evidence under *Brady*." *Virgil*, 2018 WL 344968, at *8. Also, as the district court noted in *Virgil*, although not specifically discussed by the Sixth Circuit in *Moldowan*, "the Sixth Circuit [had in fact] recognized the existence of *Brady*-derived obligations for police officers as early as 1975." *Id*. at *9 (alteration added) (citing *Hilliard v. Williams*, 516 F.2d 1344, 1360 (6th Cir. 1975), *vacated in part, Williams v. Hilliard*, 424 U.S. 961 (1975)). In *Hilliard*, the Sixth Circuit found that

the "acts and omissions" of a police officer with the Tennessee Bureau of Investigation resulted in the "deprivation of the plaintiff's 'due process and constitutional right to a fair trial under *Brady v. Maryland*,' and 'amounted to an actionable violation of 42 U.S.C. § 1983.'" *Virgil*, 2018 WL 344968, at *9 (quoting *Hilliard*, 516 F.2d at 1350). Notably, as the district court in *Virgil* points out, on remand of *Hilliard* from the Supreme Court, the Sixth Circuit noted that the judgment as to the offending police officer "will remain in full force and effect." *Hilliard v. Williams*, 540 F.2d 220 (6th Cir. 1996).

The Court concludes, as *Moldowan* held, that a police officer's duty to disclose exculpatory evidence to the prosecutor under a *Brady*-derived obligation was clearly established in 1992 when Desmond Ricks was investigated, tried, and convicted of the murder of Mr. Bennett.

## B. The Complaint Plausibly Suggests a *Brady*-derived Section 1983 Claim

Defendants next submit that, even assuming that their obligation to disclose exculpatory evidence to the prosecutor was clearly established in 1992, Plaintiffs' Complaint fails to allege a plausible *Brady*-derived claim. Defendants make the following statement in their opening brief, with no citation to authority:[2] "[T]o suggest

---

[2] In fact, in the entirety of Defendants' brief devoted to the argument that Ricks has failed to state a viable *Brady* claim, there is not one citation to a case other than a

that the exculpatory evidence was an admission that the two Defendants fabricated evidence is to logically turn a fabrication of evidence allegation into a *Brady* violation. Such a conflation defies logic and is unprecedented." (Mot. at 16, PgID 145.) But the Sixth Circuit has recently observed, in *Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017), that a plaintiff can logically plead a *Brady*-derived "withholding of evidence claim," alongside a "fabrication-of-evidence" claim. Although neither party has cited *Mills*, it is instructive here on many fronts and merits further discussion. The plaintiff, Mills, was indicted in July, 2009, and tried on several charges, including a charge for rape of a child. 869 F.3d at 477-78. Sharon Jenkins was a DNA analyst assigned by the Tennessee Bureau of Investigation ("TBI") to review evidence in Mills' case and specifically, as relevant here, a pair of the child's underwear that was found to have semen. *Id*. Jenkins compared DNA samples taken from Mills with the DNA found in the semen on the underwear and concluded that the underwear contained DNA from the child and DNA from a male contributor consistent with Mills' DNA profile. *Id*. at 478. Jenkins testified at trial that there was only a 0.3% chance that the DNA belonged to someone other than Mills. *Id.* Mills was convicted of the rape and sentenced to twenty years in prison.

--------

general reference to *Iqbal*, and that also without analysis or explication. (ECF No. 14, Mot. at 15-19.)

The Federal Public Defender and the Innocence Project became involved in Mills's habeas proceeding and sent the preserved DNA evidence for retesting. *Id.* On retesting, using the same methods used by Jenkins, it was found that the underwear contained semen from two males, neither of whom matched Mills's DNA profile. *Id.* In November, 2013, the Tennessee Court of Appeals overturned all of Mills's convictions, finding that the new DNA evidence called into question the critical testimony of the child at trial. *Id.* at 478-79.

Mills filed suit under 42 U.S.C. § 1983, alleging, among other things, that Jenkins manufactured "knowingly false inculpatory evidence against him and suppressed exonerating exculpatory evidence as a claim under *Brady*." 869 F.3d at 479 (internal quotation marks and citation omitted). The Sixth Circuit first discussed Mills's fabrication-of-evidence claim:

> In support of [the fabrication-of-evidence] claim, Mills charged Jenkins with the "manufacture and intentional misrepresentation of knowingly false inculpatory evidence," as well as the presentation of an "inaccurate" and "[un]true report." In essence, the complaint alleges that Jenkins falsified the report and data to make the DNA from the underwear appear consistent with Mills's own.
>
> The complaint further alleges that the falsity of the report prevented Mills from "be[ing] able to prove that CM had likely engaged in sexual relations with two other males ... and that she had lied about her virginity as well as Mr. Mills raping her, fondling her, and providing her with marijuana." In addition, the complaint alleges that the DNA report was the basis of Barnard's success in eliciting guilty verdicts. All of these

allegations are taken as true and all reasonable inferences are drawn in favor of Mills at this stage of the proceedings. *Directv, Inc.*, 487 F.3d at 476. These factual allegations are sufficient to show the creation of material known to be false that had an effect on the judgment of the jury. Moreover, the knowing requirement of fabrication-of-evidence claims is satisfied for the same reason as in the malicious-prosecution claim: according to the complaint, the DNA results that were provided by Jenkins were unmistakably exonerating but Jenkins chose to report that they were consistent with Mills's liability in order to support the prosecution's case and a guilty verdict.

869 F.3d at 484-85. As particularly relevant here, the Sixth Circuit found that the district court committed reversible error by failing to analyze the fabrication-of-evidence claim and the *Brady*-derived withholding of evidence of claim separately:

> The district court combined the fabrication claim and the withholding claim into one, but this was in error. In *Gregory [v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)], this court analyzed separately claims that a forensic expert withheld evidence and that the expert had fabricated evidence. *Gregory*, 444 F.3d at 744–45. This result is sensible, as the claims have different elements, most notably, that one involves the suppression of favorable evidence and the other the manufacture of damaging evidence. *See id.* at 750 (citing favorably *Atkins v. County of Riverside*, 151 Fed. Appx. 501, 505–06 (9th Cir. 2005), which permitted a plaintiff to pursue simultaneously both a fabrication-of-evidence claim and a *Brady* violation claim). Mills has stated a plausible claim that satisfies the elements of a fabrication-of-evidence claim.

*Mills*, 869 F.3d at 485. The Sixth Circuit then separately discussed the withholding of evidence claim, noting that the district court "correctly observed that the test for such a claim is derived from *Brady*," which imposes on prosecutors an obligation to disclose exculpatory evidence, an obligation extended to police officers and forensic

experts:

> As explained by the Supreme Court in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), a violation of due process results where the State suppresses evidence favorable to a defendant that is material to either his guilt or punishment and is of a nature that would have had a reasonable probability of changing the result of the proceeding. *See id.* at 432–33, 115 S.Ct. 1555. This court in *Moldowan v. City of Warren*, 578 F.3d 351 (2009), extended that obligation from prosecutors to police officers and confirmed that it reached forensic experts such as the one in *Gregory [v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)]. *Id.* at 381, 397; *see also Gregory*, 444 F.3d at 744.

869 F.3d at 485. The Sixth Circuit explained the nature of Mills's *Brady*-derived claim:

> The source of Mills's *Brady* claim, as distinguished from his fabrication claim, is that there existed additional DNA evidence—classified by Jenkins as "inconclusive"—that was in fact exculpatory. The complaint alleges that Jenkins was responsible for "the suppression of exonerating exculpatory evidence, including, but not limited to, the DNA evidence that clearly excluded Mr. Mills but was labeled as 'inconclusive.'" It further claims that the evidence "was actually exculpatory," but Jenkins's report was "incomplete" and that a full report would have proven that DNA in C.M.'s underwear was "actually conclusively someone else's DNA." These claims map onto the requirements for a *Brady* violation: (1) evidence favorable to a defendant (results that conclusively excluded Mills as contributor of the DNA); (2) that was suppressed; (3) and would have had a reasonable probability of changing the result of the proceeding (the corroboration of C.M.'s testimony by the DNA evidence was the basis of the jury's guilty verdicts).

869 F.3d at 485-86. The Sixth Circuit clarified the distinct natures of the fabrication and withholding claims: "To be clear, the wrong in the withholding claim is the

suppression of exonerating evidence that the DNA results did not match. The wrong in the fabrication claim is producing a false report that stated that the DNA in the underwear was consistent with Mills's DNA." 869 F.3d at 485 n. 4. The same is true here: the Complaint alleges that "[n]either the slugs removed from Bennett's body, nor photographs of the slugs, were provided to the prosecutor." (Compl. ¶ 51.) The Complaint further alleges that this was done consciously, knowingly, and intentionally. (Compl. ¶¶ 53-55.) The Complaint also alleges that Defendants knowingly fabricated evidence (the test-fired bullets), switched that evidence with the bullets taken from Bennett's body, supplied that evidence to the prosecutor who relied on that fabricated evidence to convict Ricks at trial. (Compl. ¶¶ 67-74.) Thus, as alleged in Plaintiffs' Complaint, "the wrong in the withholding claim is the suppression of exonerating evidence [the bullets removed from Bennett's body] that the [ballistics] results did not match. The wrong in the fabrication claim is producing a false report [and giving false trial testimony] that the [bullet retrieved from Bennett's body was fired from the alleged murder weapon]." *Mills*, 869 F.3d at 485 n. 4.

Ricks has stated a plausible *Brady* claim in the Complaint and he may plead that claim alongside his fabrication of evidence claim. Both claims will go forward. As the Ninth Circuit noted in *Atkins v. City of Riverside*, 151 F. App'x 501 (9th Cir. 2005), a case cited by the Sixth Circuit with approval in both *Mills* and *Gregory*:

Disclosing that an investigator fabricated evidence during the investigation would have instantly upset the credibility of the rest of the police investigation. Evidence that the government suppressed such a fact provides a sufficient basis for a *Brady* claim. . . . In *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (en banc), we stated that a *Brady* violation "cannot in itself support a deliberate-fabrication-of-evidence claim." But it does not follow that a fabrication of evidence claim cannot support a *Brady* claim. To hold to the contrary would be tantamount to carving an exception to the *Brady* fair trial obligation for the most egregious of misconduct (deliberate fabrication). The fact police fabricated inculpatory evidence, if true, can have both exculpatory and impeachment value. The state has the obligation to not suppress such information.

151 F. App'x at 505, 505 n. 4.[3]

Defendants also argue that the facts alleged in the Complaint fail to state a plausible *Brady*-derived claim, even assuming that a police officer's *Brady*-derived obligation was clearly established in 1992 and assuming such a claim can be pled alongside a fabrication of evidence claim. Defendants assert that "the Complaint fails to specifically allege that Officer Pauch did not disclose the recovered bullets themselves to the prosecutor." (Reply at 4, PgID 226.) This is wrong. The

---

[3] Judge Kethledge partially concurred in *Mills* but would have demanded application of a bad faith standard in the context of police officers who do not enjoy the absolute immunity of a prosecutor, have neither the legal training nor the access to the complete panoply of evidence in a case to fully appreciate the legal nuances of the case, and therefore cannot be expected to always be able to "connect the exculpatory dots" as necessary to avoid liability for a failure to disclose. 578 F.3d at 401-07. Even that heightened standard would have been met here, based on Plaintiffs' express allegations of intentional and knowing fabrication of evidence and intentional and knowing withholding of exculpatory evidence.

Complaint alleges several times that Officer Pauch possessed the bullets that were removed from Bennett's body and that he and Stawiasz ran the ballistic tests and agreed to fabricate evidence in the test report to state that the evidence bullets matched bullets fired from the Rossi. (*See, e.g.,* Compl. ¶¶ 30, 41-42, 55-57, 65-73.) The Complaint also alleges that "[n]either the slugs removed from Bennett's body, nor photographs of the slugs, were provided to the prosecutor." (Compl. ¶ 51.) Clearly here, "[t]he facts and context provided by [Ricks's] Complaint offer enough substance to permit us to 'draw a reasonable inference that'" Pauch knowingly and intentionally did not provide the bullets removed from Bennett's to the prosecutor. *Mills*, 869 F.3d at 482 (quoting *Iqbal*, 556 U.S. at 678). This is all that is required at the pleading stage.[4] Whether that allegation, in the Defendants' opinion, is belied by the fact that the evidence bullets removed from Bennett's body were present in the Detroit Police

---

[4] Judge Griffin dissented in *Mills* because of the absence of such affirmative allegations of knowing misconduct in that case. Judge Griffin reasoned that the fabrication of evidence claim failed because of the absence of allegations supporting a reasonable inference that Jenkins "knowingly manufactured false evidence." 869 F.3d at 489). Similarly, Judge Griffin reasoned that the withholding of evidence *Brady*-derived claim failed because the complaint failed to allege that Jenkins withheld information she used to make her report and in fact suggested that "Jenkins did, in fact, provide the [exculpatory] data to the prosecutor." *Id*. at 490. Here, by contrast, the Complaint expressly alleges knowing manufacture of inculpatory evidence and specifically alleges the failure to disclose to the prosecutor the existence of the exculpatory evidence, i.e. the actual bullets taken from Bennett's body. *See, e.g.* Compl. ¶¶ 51, 67-74.

file in 2017, when they were reexamined, is a factual dispute not properly addressed on a motion for judgment on the pleadings. When all of the factual allegations of the Complaint, and all reasonable inferences from those factual allegations, are accepted as true, the Complaint does allege that neither Stawiasz nor Pauch disclosed the existence of or turned over evidence of the bullets removed from Bennett's body to the prosecutor. The truth or falsity of this allegation is not at issue at the pleading stage, only the plausibility of such a suggestion based on the facts alleged. Plaintiffs' Complaint easily meets this threshold.

Defendants' argument regarding the plausibility of Ricks's *Brady*-derived claim simply disagrees with the facts and theory alleged in Plaintiffs' Complaint. This is a motion for judgment on the pleadings. As such, all of the allegations of Plaintiffs' Complaint, along with all reasonable inferences from those allegations, must be accepted as true for purposes of the Court's resolution of this motion. Accepting those allegations as true, Pauch and Stawiasz knowingly fabricated evidence, switched that fabricated evidence for the real evidence, and delivered to the ballistics expert bullets that they knew were not the bullets recovered from the victim's body, then vouched for that fabricated evidence at trial. The Complaint alleges that Pauch and Stawiasz failed to disclose to the prosecutor the existence of the exculpatory bullets that were removed from Bennett's body and also did not disclose that they had

fabricated evidence that would inculpate, and indeed was used to convict, Ricks. While Defendants undoubtedly will contest these allegations as the case proceeds, they cannot contest them at this stage of the proceedings.

## C. Plaintiffs Have Adequately Alleged That Pauch Was a City of Detroit Police Officer

Plaintiffs allege that, "[a]t all pertinent times, DAVID PAUCH ("PAUCH") was employed as a police officer and Evidence Technician for the DPD." (Compl. ¶ 6.) Plaintiffs submit a March 6, 1992 Laboratory Analysis, setting forth the results of his examination of the bullets, that Pauch signed "David Pauch, Police Officer, Firearms Examiner." (Compl. Ex. 1, PgID 32.) Plaintiffs have adequately alleged that Pauch was a DPD police officer. That he may also have been a ballistics technician does not "unmake" him a police officer.

## D. Plaintiffs Have Plausibly Pled a *Monell* Failure to Train Claim

Defendants submit that, because Defendants have failed to plead a plausible *Brady*-derived claim against either Pauch or Stawiasz, their *Monell* claim for failure to train based on that alleged constitutional violation must also be dismissed. Because the Court finds that a *Brady*-derived claim has been plausibly pled against both Pauch and Stawiasz, the Court DENIES Defendants' motion for judgment on the pleadings on a *Brady*-derived *Monell* claim. *See Cristini v. City of Warren*, No. 07-11141, 2012

WL 5508369, at *13-14 (E.D. Mich. Nov. 14, 2012) (in a case involving the same facts as *Moldowan* with regard to a different defendant, finding that the facts alleged in *Moldowan* sufficiently stated a failure to train claim against the City of Warren).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the Defendants' motion and Ricks's *Brady*-derived claim will proceed.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: May 30, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 30, 2018.


s/Deborah Tofil
Case Manager