UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESMOND RICKS, AKILAH
COBB, and DESIRE'A RICKS,

                    Plaintiffs,                        Case No. 17-12784

v.                                                     Paul D. Borman
                                                       United States District Judge
DAVID PAUCH, DONALD
STAWIASZ, and ROBERT B.
WILSON,

                    Defendants.
_____/

## OPINION AND ORDER
## (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## (ECF NO. 91), AND
## (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
## JUDGMENT (ECF NO. 92)

Plaintiff Desmond Ricks ("Ricks") was released from prison in 2017 after

serving 25 years on a wrongful conviction for murder. Ricks and his two adult

daughters have filed this suit under 42 U.S.C. § 1983 against the City of Detroit and

three City of Detroit police officers alleging violations of Ricks' constitutional rights

based upon alleged fabrication and withholding of evidence. The City of Detroit has

since been dismissed with prejudice pursuant to a Stipulated Order of Dismissal.

Now before the Court are cross-motions for summary judgment: (1) Plaintiffs'

Motion for Partial Summary Judgment as to Defendants David Pauch and Robert

Wilson; and (2) Defendants' Motion for Summary Judgment. These motions were

fully briefed and the Court held a hearing on November 13, 2019.  For the reasons

that follow, the Court DENIES both motions.

I.    **FACTUAL BACKGROUND**

A.    **Plaintiff Desmond Ricks' 1992 Conviction**

1. **Gerry Bennett's Murder**

On March 3, 1992, at approximately 4:45 p.m., Gerry Bennett was shot to

death in the parking lot of a Top Hat restaurant located at 16101 James Couzens, in

the City of Detroit.  (ECF No. 37, First Amended Complaint ("FAC") ¶ 9; ECF 91-

31, Homicide Scene Investigation.)   Plaintiff Desmond Ricks, a friend of Bennett's,

had accompanied Bennett to the Top Hat restaurant in a red Ford Escort, driven by

Bennett.  (FAC ¶ 10; ECF No. 91-10, Desmond Ricks Deposition Tr. at p. 132.)  The

parties dispute whether Ricks accompanied Bennett into the restaurant and Ricks'

possible involvement in Bennett's murder.

a. **Plaintiffs' version of the events leading to Bennett's murder**

According to Ricks, shortly after arriving at Top Hat, a yellow Chevrolet

Monte Carlo pulled up next to the Ford Escort he and Bennett were in.  Bennett got

out of the Escort and entered the restaurant with a light-skinned black man of

medium height who got out of the back seat of the Monte Carlo. (Ricks Dep. at pp.

137-42; Homicide Scene Investigation at pp. 3-4.)   Ricks remained in the front

passenger seat of the Escort.  (Ricks Dep. at p. 142.)  When Bennett and the other

man exited the restaurant about five to ten minutes later, Ricks saw the light-skinned black man point a chrome handgun at Bennett and shoot him in the stomach. (*Id.* at pp. 144-45.) As Ricks got out of the Escort, he saw the other man shoot Bennett in the head, then turn to shoot at Ricks. (*Id.* at p. 146.)

### b. Defendants' version of the events leading to Bennett's murder

According to Defendants, Ricks was Bennett's middleman who arranged drug deals for Bennett, but the Top Hat drug deal was a set up. (ECF No. 91, Defs.' Mot. S.J. at p. 2, citing ECF No. 91-3, Trial Tr. Vol. 2, Cheryl Thomas Testimony at p. 60; ECF Nos. 91-11 & 91-12, Prison phone call recordings.) When Bennett and Ricks arrived at Top Hat, Bennett had cocaine on his person and more cocaine in a Girl Scout cookie box hidden under Ricks' seat in the car. (Defs.' Mot. S.J. at p. 3, citing ECF Nos. 91-6, 91-25 through 91-29, Prison phone call recordings.) Defendants contend that Ricks accompanied Bennett into the restaurant, where Bennett ordered food. (Trial Tr. Vol. 2, Ollie McAdoo Testimony at pp. 85-87.) After Ricks and Bennett stepped back outside the restaurant, they engaged in an argument and Bennett was shot. (Trial Tr. Vol. 2, Howard Dillworth Testimony at pp. 104-05; Homicide scene investigation; ECF No. 91-32, Prelim. Exam Tr. Dillworth Testimony at pp. 26-27; ECF No. 91-34, Trial Tr. Vol. 3, P.O. Kimber Testimony at p. 9, Arlene Strong Testimony at pp. 66, 80; ECF No. 91-35, P.O.

Donald Robertson Homicide Report; ECF No. 91-36, P.O. Welborn Griggs Prelim. Compl. Record; ECF No. 91-37, P.O. Bradley Belcher Prelim. Compl. Record.) Defendants assert that at the time of the shooting, Bennett's vehicle was the only vehicle in the parking lot. (Defs.' Mot. S.J. at p. 4, citing Prelim Exam. Tr. Dillworth Testimony at pp. 26-27; Trial Tr. Vol. 2 Dillworth Testimony at pp. 104-05, 117; ECF No. 91-39 Cheryl Thomas Witness Statement at p. 2.)

## 2. Events Following the Shooting

The parties agree that immediately following the shooting, Ricks ran into an adjacent neighborhood, shedding his winter coat as he ran. (FAC ¶ 12; Prelim. Exam. Tr. Dillworth Testimony at pp. 27-28; Trial Tr. Vol. 2 Dillworth Testimony at pp. 99, 105; ECF No. 91-30, Ollie McAdoo Witness Statement; ECF No. 91-38, Trial Tr. Vol. 4 Ricks Testimony at pp. 23, 63.) Ricks asserts that he shed his coat to avoid it being caught in bushes as he ran (Ricks Dep. at p. 153), while Defendants contend that Ricks discarded his coat and hat in an attempt to hide his identity. (Prelim. Exam. Tr. Dillworth Testimony at pp. 27-28; Trial Tr. Vol. 2 Dillworth Testimony at pp. 99, 105; Ollie McAdoo Witness Statement at p. 2; Homicide Scene Investigation; ECF No. 91-33, Police Officer Chimene Irvin Prelim. Compl. Record; Trial Tr. Vol. 4 Ricks Testimony at pp. 23, 63.) Defendants state that Ricks made no attempt to notify the police of the shooting but instead hid and did not initially tell his friends or family that he was present when Bennett was shot. (Trial Tr. Vol.

4 Ricks Testimony at pp. 26-28, 82-84, 94; Ricks Dep. at p. 160.) The parties agree that Ricks' coat was later found by Detroit Police Department ("DPD") officers, and that it contained Ricks' visitor's pass to Hutzel Hospital in the jacket pocket, where his girlfriend had just given birth to their daughter, Plaintiff Desire'a. The coat also contained a phone book and a picture of his newborn baby. (Ricks Dep. at p. 165; Homicide Scene Investigation; ECF No. 91-40, Evid. Prop. Sheet at p. 3; ECF No. 91-41, Evid. Tech. Rpt. at p. 1; Trial Tr. Vol. 4 Ricks Testimony at pp. 5-6.)

### 3. The March 4, 1992 Autopsy

A hospital physician declared Bennett "dead on arrival." (Police Officer Bradley Belcher Prelim. Compl. Record.) Assistant Medical Examiner, Dr. Sawait Kanluen, performed an autopsy on Bennett's body on March 4, 1992. (ECF No. 91-60, Med. Examrs.' Rpt. at p. 1.) Dr. Kanluen described two gunshot wounds. He retrieved one bullet from Bennett's brain, where it lodged after penetrating his skull, and retrieved a second bullet lodged in Bennett's spine. (*Id.*) Dr. Kanluen placed each bullet (or slug) in a separate, small bullet envelope, and turned those evidence bullets over to the liaison DPD officer assigned to the Medical Examiner's Office, homicide sergeant James Covington. (Trial Tr. Vol. 3 Covington Testimony at pp. 18-19.) Covington in turn delivered the bullets to Defendant Donald Stawiasz, assigned as the Officer-In-Charge of the investigation. (*Id.*; ECF No. 91-47, Donald Stawiasz Deposition Tr. at p. 62.) Stawiasz placed the smaller bullet envelopes into

larger evidence envelopes, with the slug recovered from the head on evidence tag #923409, and the slug recovered from the spine on evidence tag #923410. (Trial Tr. Vol. 3 Stawiasz Testimony at pp. 31-32; Stawiasz Dep. at p. 111; Prelim. Exam. Tr. Covington Testimony at p. 36.) Those slugs were delivered, on Stawiasz's request, to Defendant Pauch, a firearm and tool-mark examiner in the Detroit Crime Lab. (ECF No. 91-61, Pauch & Wilson Firearms Identification Report.)

### 4. Ricks' March 5, 1992 Arrest

On March 5, 1992, Detroit Police Officers, a federal ATF agent, and a Deputy U.S. Marshal, none of whom are defendants in this case, arrived at Ricks' mother's house at 16500 Hubbell Street in Detroit. (ECF Nos. 91-43, Police Officer James Fleming Prelim. Compl. Record; 91-44, ATF Special Agent Curtis Brunson Rpt. of Interview with Fleming; 91-45, Statement of ATF Special Agent Anthony Primak.) The officers did not have an arrest warrant or search warrant, but Mary Ricks, Plaintiff Desmond Ricks' mother, allowed the officers into the residence. (*Id.*; Prelim. Exam. Tr. P.O. Fleming Testimony at p. 34.) Ricks was arrested without incident. (Police Officer James Fleming Prelim. Compl. Record; ATF Special Agent Curtis Brunson Rpt. of Interview with Fleming; Statement of ATF Special Agent Anthony Primak.) Ricks' mother stated that her son was not involved in any murder and that the only firearm in the house was a gun she owned, which she kept in her bedroom under her pillow. (*Id.*) Ms. Ricks allowed the officers to take her handgun,

a Rossi .38 Special, 5-shot revolver, serial # D373334 ("the Rossi handgun"). (*Id.*)

The officers placed the Rossi handgun on evidence tag #923423. (*Id.*) Ricks was

conveyed to the Homicide Section for questioning, and the Rossi handgun was

turned over to the Homicide Section for ballistics testing. (Primak Statement.)

### 5. Firearm Testing

#### a. Pauch and Wilson's March 6, 1992 Firearm Identification Report

On March 6, 1992, the day after Ricks was arrested, Defendant Stawiasz

requested that firearm testing be conducted on the Rossi handgun taken from Ricks'

home, to compare test-fired bullets to the slugs removed from Gerry Bennett's body.

(ECF No. 92-5, Request for Lab. Serv.) As Defendants explain:

> The forensic evidence at issue, the evidence bullets or slugs, is known as firearms and tool mark evidence. Tool mark identification seeks to determine if a tool mark was produced by a particular tool. Firearm identification is a sub-category of tool mark identification to determine if a bullet was fired by a particular firearm. When a bullet is fired in a gun, the lands and grooves in the gun barrel cut into the bullet's softer metal leaving discernible markings. Firearms examiners attempt to determine whether a bullet recovered from a crime scene or victim's body was fired by a particular gun by comparing microscopic markings on the recovered bullet to the markings on a bullet fired from that gun.

> In the field of firearms identification, there are four evaluation outcomes: (1) unsuitable for examination; (2) inconclusive; (3) elimination; or (4) positive for a match. A firearms examiner's conclusion of "unsuitable" means the bullet is too damaged to examine. The examiner may also use "inconclusive" if the bullets are too damaged to examine. This occurs when a bullet hits a hard object. Bullets fired into bone tend to be unsuitable more often than those fired into soft tissue

(Defs.' Mot. S.J. at p. 9 (citing *What is Firearm and Tool Mark Identification?"* Association of Firearms and Toolmark Examiners, https://AFTE.org).)

Stawiasz submitted the Rossi handgun to the Detroit Crime Lab for testing, which had previously received the slugs from Bennett's body. (Request for Lab. Serv.) Defendant David Pauch was the assigned examiner, and Defendant Robert Wilson was his immediate supervisor. (Pauch and Wilson Firearms Id. Rpt.; ECF No. 91-62, David Pauch Deposition Tr. at p. 39.) Defendants assert that Pauch, Wilson and Stawiasz did not actually transport the slugs from the property room to the Crime Lab. (Pauch & Wilson Firearms Id. Rpt.; Pauch Dep. at pp. 35, 109-11.)

On March 6, 1992, Pauch, with Stawiasz present, test fired bullets from the Rossi handgun and compared those test-fired bullets to the bullets removed from Bennett's body. (*Id.*; Prelim. Exam. Tr. Pauch Testimony at p. 39; Trial Tr. Vol. 3 Pauch Testimony at p. 53.) Wilson, as Pauch's supervisor, also independently examined the bullets and compared them to the test-fired bullets from the Rossi handgun. (ECF No. 91-63, Robert Wilson Deposition Tr. at pp. 45-46; Pauch Dep. at p. 110.)

As explained more fully below, bullets and guns are classified by the number of lands and grooves of a gun and the direction of twist (right-hand or left-hand) of the barrel. By examining the lands and grooves and the direction of twist of a firearm or bullet, these "class characteristics" can help to determine whether a certain bullet

was fired from a certain gun. *See* Section I.C.1, Overview of Firearms Identification, below.

Pauch states that he could not count or measure the lands and grooves of the evidence bullets because they were too damaged. (Pauch Dep. at pp. 78, 84, 99.) He thus could not identify the general rifling characteristics or class of gun that fired the evidence bullets. (*Id.* at pp. 78, 103, 106.) He indicated on the lab report that the evidence bullets had "traces of lands and grooves." (Pauch & Wilson Firearms Id. Rpt.) Pauch further noted on the report that the Rossi handgun was classified as a "6-R", which means that the barrel of the gun would cut six grooves (and corresponding lands) into the surface of a bullet when fired, while the "R" designation signifies a right-hand rotation or twist. Pauch compared the evidence slugs with the test-fired bullets from the Rossi handgun and opined in the firearm report that the comparison "yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon." (*Id.* (capitalization in original).) Wilson states that he performed a microscopic examination, confirmed the match found by Pauch, and signed the report. (Wilson Dep. at p. 45; Pauch & Wilson Firearms Id. Rpt.) The evidence was then returned to the property room. (Wilson Dep. at pp. 70-71; Pauch Dep. at p. 103.)

Plaintiff was arraigned on Murder II on March 7, 1992, pleaded not guilty, and was remanded to jail. (ECF Nos. 91-64, Case Control Card; 91-65, Information

for Arraignment on Warrant.)  Plaintiff's Preliminary Examination was held on March 19, 1992, and the Judge found that probable cause existed.  (Prelim. Exam. Tr. at pp. 42-43.)

### b.  David Townshend firearm testing

On June 5, 1992, the trial court granted Ricks' motion to appoint a firearms identification expert and ordered that all tests be performed at the Detroit Police facilities.  (ECF No. 91-66, Mot. and Final Conf. Tr. at pp. 18, 23-24.)  Plaintiff retained David Townshend, a retired Michigan State Police firearms examiner, to serve as the appointed expert.  (ECF No. 91-74, David Townshend Deposition Tr. at pp. 85, 87.)

On July 15, 1992, the trial court entered an Order that the physical evidence, specifically, the slugs removed from Bennett's body and the Rossi handgun, be examined by Townshend, and that Townshend shall be allowed to test fire the Rossi handgun.  (ECF No. 91-68, July 15, 1992 Court Order.)  That Order further provided that Defendant Stawiasz be present during the entire time the tests are performed and that "[t]he tests will be conducted at the Detroit Police Department." (*Id.*) Townshend received a copy of the Pauch and Wilson Firearms Identification Report on July 20, 1992.  (ECF No. 91-72, Townshend Invoice.)

On August 6, 1992, the trial court issued a new Order that Townshend's examination take place at Townshend's lab in Mason, Michigan instead of the

Detroit Police Department, and directing Defendant Stawiasz to transport the evidence to and from Townshend's lab. (ECF No. 91-69, August 6, 1992 Court Order.)[1]

Stawiasz transported the evidence to Townshend's lab for testing on August 16, 1992. (Stawiasz Dep. at p. 68.) Townshend test-fired the Rossi handgun provided by Stawiasz, microscopically examined the "evidence bullets" provided by Stawiasz, compared those "evidence bullets" to the bullets Townshend test-fired from the Rossi handgun, and concluded that the bullets represented by Stawiasz to have come from the victim's body matched the Rossi handgun. (ECF No. 91-77, Townshend 8/17/92 Firearms Identification Report.) Townshend testified that he was concerned that the two "evidence bullets" he was given to examine were "too pristine" to have been recovered from the victim's body, but that when he questioned

---

[1] Townshend surmises that this location change was a result of "animosity" towards him by the Detroit Police Department as a result of his microscopic examination results and trial testimony in a prior shooting case that conflicted with the testimony of the Detroit Police Department firearms examiner regarding the positive identification of the evidence bullet. (ECF No. 91-83, David Townshend Affidavit at p. 1.) He asserts that this animosity is "exemplified in a letter written by Deputy Chief Gloria Reynolds[,] the Director of the D.P.D. Crime Lab[,] and the Assistant Prosecuting Attorney Kenneth E. Simon." (*Id.*) This letter was not attached as an exhibit to Townshend's Affidavit filed in support of Plaintiffs' Motion for Summary Judgment but was discussed during Townshend's deposition. (Townshend Dep. at pp. 110-16.) According to Townshend's testimony, the "Reynolds letter" requests that the Michigan State Police evaluate the evidence in this case instead of Townshend because Reynolds claims that Townshend invariably concludes that the evidence is such that no conclusion can be made as to whether there is a match. (*Id.*)

Stawiasz about this, Stawiasz assured Townshend that the bullets provided to him were in fact from the victim's body. (Townshend Dep. at pp. 127-28.) However, Townshend did not note this concern in his report. (*See* Townshend 8/17/92 Firearms Id. Rpt.)

### 6. Ricks' Conviction

Ricks' jury trial began on September 16, 1992. Pauch and Wilson's and Townshend's firearms identification evidence was admitted. Defendants contend that, at trial, the prosecutor, Ken Simon, and several witnesses opened up the small bullet envelopes and observed the slugs. (ECF No. 67, Kenneth Simon Deposition Tr. at pp. 33-38; Trial Tr. Vol. 2, Kanluen Testimony at pp. 39-41; Trial Tr. Vol. 3, Pauch Testimony at p. 51; Townshend Testimony at pp. 88-90.) Assistant Medical Examiner Kanluen testified he had removed the slugs from Bennett's body, and Townshend identified the slugs as the evidence bullets he had examined and compared to test shots. (Trial Tr. Vol. 2 Kanluen Testimony at pp. 39-41; Trial Tr. Vol. 3 Townshend Testimony at pp. 88-89; Simon Dep. at pp. 33-34, 37-38.) Specifically, Kanluen testified:

> Q.  [By Simon] Could you open up the envelope [Evidence Tag#923049] and tell us if you recognize the contents of it?

> A.  [By Kanluen] Inside the envelope is the one that I was talking about is the bullet envelope, and marked in front of the envelope is the name of the deceased black, 22 years old male and also my name. The doctor who did the autopsy. Date of the autopsy, March 4th and where the contents come from. One inside the

head.  Also, I put down our medical examination file number 1994—92.

Q.     All right.  And could you look at the inside of that envelope?

A.     This is the spent slug or bullet that come [sic] from the deceased' [sic] head.

* * *

Q.     Could you open up that envelope [Tag #923410] and tell us if you recognize the contends [sic]?

A.     Again this is the similar bullet envelope that we used, and I marked down the deceased' [sic] name.  Gerry Bennett, 22 year old black male.  Signed my name in front of envelope.  Date of the autopsy March 4, 1992.  This was the contents coming from the back bone and also the same medical examiner file number 1994 – 92.

Q.     Could you open that envelope please.

A.     This is a spent slug, a bullet that I retrieve[d] from the back bone of the deceased.

(Trial Tr. Vol. 2, Kanluen Testimony at pp. 40-41.)

And, Townshend testified as follows:

Q.     [By Simon] All right. Now I'm going to have you open up the envelope [for Tag #9234109] if you can and see if you recognize a smaller envelope that's inside?

A.     [By Townshend] Contained in evidence tag number 923409 is sealed with a tie string.  Wayne County Medical Examiner bullet evidence envelope, and I marked in the corner of the envelope my initials, D.T. written in this corner.

Q.     Let me open this up and ask you is this slug that's in here the one that you put your initials on? Is that the slug that you used in your comparison?

A.     That's correct.  Yes, sir.

Q.     For the record we have just been looking at the contents of People's Exhibit Number Two.  Let's go on to People's Exhibit Number Three which is 923410.  Could you open up that and see if you recognize the smaller envelope in there?

A.     Yes, sir.  Contained in People's Exhibit Number Three is also a sealed with a tie string Wayne County Medical Examiner's bullet envelope.  In the corner of the envelope I marked my initials, D.T. upon the corner.

Q.     Can you open up the smaller envelope?  Is that one of the slugs you used, the second of the two slugs you used in doing your comparison work?

A.     Yes, sir, it is.

(Trial Tr. Vol. 3 at pp. 88-89.)[2]

Pauch testified during the 1992 trial that the match between the evidence bullets he examined and the test-fired bullets was like a "fingerprint" and that "[t]hese bullets were fired from this weapon and no other weapon."  (Trial Tr. Vol.

---

[2] Townshend subsequently testified in his July 19, 2018 deposition that the bullets he looked at during the 1992 trial had "[v]ery little damage," "very little distortion at all," and "looked like a test bullet."  (Townshend Dep. at pp. 177-79.)  He testified that he did not comment that the bullets looked "pristine" in 1992 because he "answered the questions that [he] was asked," and he had been told that those were the evidence bullets and he proceeded on that belief.  (*Id.*)

3, Pauch Testimony at pp. 52, 53.)   The prosecutor, Simon, stressed the physical evidence at his closing:

> This case, ladies and gentlemen, comes down to really one thing, one piece of evidence, and that is this gun here.  Because this is the one … inescapable fact of this case is that this gun is the weapon that killed Gerry Bennett.  And this gun … was found at the defendant's house.  That's the one inescapable fact.  No matter how the defendant tries to escape it, he can't.  This gun that killed Gerry Bennett was found at his house.

(Trial Tr. Vol. 4, Prosecutor Simon's Closing at p. 107.)

A jury convicted Ricks of second-degree murder and felony firearm on September 23, 1992.  (ECF No. 92-19, Judgment of Sentence, 10/12/92.)  Ricks was sentenced to serve 42-62 years in prison.  (*Id.*)  His direct appeals to the Michigan Court of Appeals and Michigan Supreme Court were unsuccessful, as was his first Motion for Relief from Judgment.   (ECF No. 91-85, Stipulated Order Granting Defendant's Successive Motion for Relief from Judgment.)

### B.    Reconsideration of the Evidence

#### 1.  Ricks Contacts Townshend

While imprisoned, Ricks contacted Townshend and requested his help. (Ricks Dep. at pp. 38-40.)  In April 2015, Townshend examined digital photographs of the evidence bullets that had been received by the Michigan Innocence Project, and he signed an affidavit on July 8, 2015 stating that the photographs showed "lead bullets that are severely mutilated and extensively damaged." (Townshend Aff. at p.

3.) He further stated that those evidence bullets depicted in the photographs "are not the fired bullets [he] received and microscopically examined on August 15, 1992." (*Id.*) He continued that "[t]he fired bullets exhibited in the digital photographs are in such a mutilated and damaged condition it is doubtful that a positive identification with a suspect firearm would be possible." (*Id.*) Townshend opined that "[a] new examination of the evidence on this case is warranted." (*Id.*)

### 2. Ricks' Successive Motion for Relief from Judgment and Molnar's Examination of the Evidence Bullets

On June 1, 2016, Ricks filed a Successive Motion for Relief from Judgment, relying primarily on Townshend's July 8, 2015 affidavit. (Stip'd Order Granting Def.'s Successive Mot. for Relief, ¶ 6.) During the post-conviction proceedings, the court ordered, and the parties agreed, to have the slugs re-evaluated by the Michigan State Police Crime Lab. (*Id.* ¶¶ 11-12.)

Michigan State Police Sergeant Dean Molnar was assigned to conduct the evaluation. The Detroit Police Department had retained the slugs, but the Michigan State Police had previously destroyed the Rossi handgun after Ricks' appeal and initial motion for relief from judgment were denied. (*Id.* ¶ 11; ECF No. 91-86, Evidence Tag Audit History for ET#923423.) Molnar thus cold not fire test shots from the Rossi handgun and compare those test-fired bullets to the evidence bullets. Instead, Molnar was asked to analyze the evidence bullets themselves and identify the slugs to the *class* of the revolver (the Rossi handgun) reported by Pauch in his

Report (6 lands and grooves with a right twist – a "6R"). (ECF No. 91-87, Dean Molnar Deposition Tr. at pp. 15-17; Pauch & Wilson Firearms Id. Rpt.)

In his examination, Molnar measured the caliber of the bullets, weighed them, and noted visible land and groove markings with a right twist. He concluded that both evidence bullets were too deformed to make a positive match with each other, meaning that he could not positively identify that the bullets were fired from the same gun. (Molnar Dep. at p. 22; ECF No. 91-88, Molnar April 2017 Firearms Identification Report.) The Wayne County Court noted that that Molnar's "inconclusive comparative findings … could not corroborate DPD's match, but his classification of the spent projectiles was largely consistent with that reported by the DPD Lab – the spent projectiles were members of the .38 with traces of lands and grooves." (Stip'd Order Granting Def.'s Successive Mot. for Relief, ¶ 15.)

However, after submitting his findings to a supervisor, Molnar was instructed to: (1) go through his measurements and make any more specific classification findings, if possible, on the individual bullets; (2) utilize the Association of Firearm and Toolmark Examiners ("AFTE") Chart; and (3) conduct an analysis of the evidence bullets to FBI General Rifling Characteristics ("GRC") Standards. (Molnar Dep. at pp. 58, 72-73; Stip'd Order Granting Def.'s Successive Mot. for Relief, ¶¶ 17-18.) When he did so, Molnar again found that the slug removed from the head wound (Slug #1, ET#923409) was too distorted to identify any number of

lands and grooves and remained "inconclusive." But Molnar was able to make a positive classification that the second evidence bullet (ET#923410) has five lands and grooves with a right twist (a "5R" classification). (Molnar Dep. at p. 31; ECF No. 91-90, Molnar May 2017 Corrected Firearms Identification Report.) Molnar testified that, based on his examination of the evidence bullets in April of 2017, the evidence bullet (classified as "5R") did not come from the Rossi handgun (classified as "6R"). (Molnar Dep. at p. 31.)

On May 26, 2017, the Wayne County Circuit Court granted Plaintiff's successive Motion for Relief from Judgment, vacated Ricks' convictions and judgment, and ordered a new trial. (Stip'd Order Granting Def.'s Successive Mot. for Relief at p. 4.) An Order of Nolle Prosequi was subsequently entered on June 1, 2017 and the case against Ricks was dismissed with prejudice. (ECF No. 91-92.)

## C. Experts' Testimony

### 1. Overview of Firearms Identification

The court in *United States v. McCluskey*, No. 10-2734, 2013 WL 12335325 (D.N.M. Feb. 7, 2013) provides a helpful overview of firearms and toolmark identification:

> Forensic toolmark identification is a discipline that is concerned with the matching of a toolmark to the specific tool that made it. Firearm identification is a specialized area of toolmark identification dealing with firearms, which involve a specific category of tools. Gov't Ex. 5, Richard Grzybowski, et al., *Firearm/Toolmark Identification: Passing*

*the Reliability Test Under Federal and State Evidentiary Standards*, at 3. "Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object." Gov't Ex. 1 and Deft. Ex. E, National Research Council, *Strengthening Forensic Science in the United States: A Path Forward*, at 150 (National Academies Press 2009). Toolmarks associated with a firearm may occur in the commission of a crime when "the internal parts of a firearm make contact with the brass and lead that comprise ammunition." *Id.* "The manufacture and use of firearms produces an extensive set of specialized toolmarks." *Id.* at 150–51.

In *United States v. Otero*, 849 F. Supp. 2d 425, 427-28 (D.N.J. 2012), the court provided a helpful and concise description of the "AFTE" (Association of Firearms and Toolmark Examiners) theory of firearm identification. Toolmark identification is based on the theory that tools used in the manufacture of a firearm leave distinct marks on various firearm components, such as the barrel, breech face, or firing pin. The theory further posits that the marks are individualized to a particular firearm through changes the tool undergoes each time it cuts and scrapes metal to create an item in the production of the weapon. Toolmark identification thus rests on the premise that any two manufactured products, even those produced consecutively off the same production line, will bear microscopically different marks. With regard to firearms, these toolmarks are transferred to the surface of a bullet or cartridge casing in the process of firearm discharge. Depending on the tool and the type of impact it makes on the bullet or casing, these surface marks consist of either contour scratch lines, known as striations (or striae), or impressions. For example, rifling (spiraled indentations) inside of a gun barrel will leave raised and depressed striae, known as lands and grooves, on the bullet as it is fired from the weapon, whereas the striking of the firing pin against the base of the cartridge, which initiates discharge of the ammunition, will leave an impression but not striae.

Comparing a test bullet or cartridge fired from a firearm of known origin to another bullet or cartridge of unknown origin, the examiner

seeks to determine congruence in the pattern of marks left on the examined specimens. This process is known as "pattern matching." When the marks consist of striations, the identification process can involve a method that observes and counts consecutively matching striae ("CMS"). When one is comparing striated tool marks, CMS is a convenient way to describe for other examiners the extent of agreement the examiner has observed. Gov't Ex. 6, Ronald Nichols, "The Scientific Foundations of Firearms and Tool Mark Identification—A Response to Recent Challenges." An examiner observes three types of characteristics on spent bullets or cartridges: class, subclass and individual. Class characteristics are features common to most if not all bullets and cartridge cases fired from a type of firearm—for example, the caliber and the number of lands and grooves on a bullet. Individual characteristics are microscopic markings produced in the manufacturing process by the random imperfections of tool surfaces (the constantly changing tool as described above) and by use of and/or damage to the gun post-manufacture. According to the theory of toolmark identification espoused by AFTE, individual characteristics "are unique to that tool and distinguish it from all other tools." *Theory of Identification as it Relates to Toolmarks*, AFTE Journal, Vol. 30, No. 1, Winter 1998, at 87. Subclass characteristics generally fill the gap between the class and individual characteristics categories. They are produced incidental to manufacture but apply only to a subset of the firearms produced, for example, as may occur when a batch of barrels is formed by the same irregular tool.

The firearms examiner uses a comparison microscope to examine the markings on at least two cartridge casings, one of which is known to have been test fired from a particular weapon. If the individual markings on the two casings show sufficient similarity, the examiner can conclude that the cartridges were fired from the same weapon. Sufficient similarity exists when the casings, viewed by a trained and experienced firearms examiner, evince sufficient duplication of markings that they can be considered individual characteristics, and the likelihood that another gun could have made them is so remote that it can be discounted.

*Id.* at \*3-4.

## 2. Plaintiffs' Expert David Balash

David Balash, a former firearms identification expert for the Michigan State Police, examined the evidence bullets on November 15, 2017, and issued an expert report on June 18, 2018. (ECF No. 93-14, Balash Report.) Balash states that when he was shown photographs of the evidence bullets, he "immediately knew/identified the bullets as having 5 lands and grooves with a right twist rifling." (*Id.* at p. 3.) He concluded, on examination of the bullets, that although they were "badly damaged," they "both clearly display class rifling specifications of 5 land[s] and groove[s] with a right twist rifling." (*Id.* at pp. 3-4.) However, "[d]ue to the damage sustained to these bullets, [Balash] did not attempt to identify them with each other without a suspect firearm from which [he] could obtain pristine tests [sic] shots for that comparison." (*Id.* at p. 4.)

He testified that the evidence bullets are classified as "5-Right" (or "5R") while the Rossi handgun is classified as a "6-Right" (or "6R"), and that a bullet with 5R characteristics cannot have been fired from a gun with 6R characteristics. (ECF No. 92-22, David Balash Deposition Tr. at pp. 100-01.) He further testified that a positive identification (or "match") between the evidence bullets and the Rossi handgun is "exceptionally unbelievable" and could only have been the result of gross incompetence or intentional false conclusion. (*Id.* at pp. 57, 67-68, 97.)

### 3. Plaintiffs' Expert David Townshend

Townshend stated in his July 8, 2015 Affidavit that the bullets provided to him in 1992 by Defendant Stawiasz were not the same "evidence bullets" he saw in photographs in April 2015. (Townshend Aff. at p. 3.) Townshend stated that he examined the actual evidence bullets for the first time on April 23, 2018. (Townshend Dep. at p. 204.) He opined that the evidence bullets "exhibit class rifling characteristics of 5 lands and grooves with a right twist," and that the two evidence bullets "were probably fired from the same revolver," but that "without having the revolver to fire test shots, it is not possible to make a positive identification." (ECF No. 92-25, June 16, 2018 Townshend Report at p. 2.) He then opined that "the 5-shot Rossi revolver with serial number D373334 has class rifling characteristics of 6 lands and grooves with a right twist and could not have fired the 2-38 Special caliber fired bullets identified as ET#923409 and ET#923410." (*Id.*) According to Townshend, the "misidentification" of the evidence bullets as having been fired by the Rossi handgun is a "catastrophic error" that "would never be made by a competent qualified firearms examiner, let alone two firearm examiners," and that mistake "could only have been caused by incompetency of the firearms examiners, or a deliberate attempt to mislead on the part of" Defendants Pauch and Wilson. (*Id.* at p. 4.) Townshend testified that "a couple minute examination" of the bullets would have yielded a conclusion that the "rifling doesn't line up, there's

– there's no way that the lands and grooves line up to where could be fired from the same gun." (Townshend Dep. at pp. 263-64.)

### 4. Defendants' Expert Jay Jarvis

Jay Jarvis is a forensic firearms expert who worked for the Georgia Bureau of Investigations ("GBI") for 32 years as an expert in firearms identification, and he was the Director of the American Society of Crime Laboratory Directors. (ECF No. 92-26, Jarvis C.V.)

Jarvis examined the evidence bullets on November 27, 2017, and issued his "Official Report" on November 30, 2017. (ECF No. 92-27, Jarvis Official Rpt.) He explained that "[d]ue to damage, the rifling characteristics [of the two evidence bullets] were determined by dividing the bullet circumference by the combined widths of the best available land and groove impressions." (*Id.* at 1-2.) He further explained in his deposition that this is a "simple calculation" and "pretty basic," one of the first things he learned when training in the field and that he would expect every firearms examiner to know this calculation early on. (ECF No. 91-89, Jay Jarvis Deposition Tr. at pp. 33-35, 38-39.) He concluded in his Official Report that:

> The item 1 bullet from the decedent's head was compared microscopically with the item 2 bullet from the decedent's back. There were sufficient corresponding individual characteristics on both the land and groove impressions on multiple areas of the bullets to conclude the two bullets were fired from the same firearm barrel.

> Based on data in the 2010 version of the General Rifling Characteristics File published by the FBI Laboratory and the undersigned's previous experience, the rifling characteristics of five lands and grooves with a right twist exhibited on the item 1 and 2 bullets are commonly found in Smith & Wesson, Ruger, and Taurus .38 Special and .357 Magnum revolvers. This does not preclude the possibility that a firearm produced by a different manufacturer with the same rifling characteristics could have fired the two bullets.

(Jarvis Official Report at p. 2.)

Jarvis testified that the evidence bullets are classified as "5-Right," that a bullet with 5R characteristics cannot have been fired from a gun with 6R characteristics, and that "based on [his] experience, … every Rossi [handgun] that [he has] ever seen has six lands and grooves with a right twist." (Jarvis Dep. at pp. 45, 54.) He further testified that he "would expect that someone who was competent would not have made" the error Pauch and Wilson did in finding that the 5R bullets were fired from a 6R gun, and that he would be "shocked that two individuals that went through the entire process could come to the same wrong conclusion." (*Id.* at pp. 57-58.) He stated that such an error is "one of two things, either they're – it was a horrible mistake or it was deliberate, I don't know of any other way it can be." (*Id.* at p. 58.)

### D.    Procedural History

Plaintiffs filed their Motion for Partial Summary Judgment as to Defendants Pauch and Wilson on February 6, 2019. (ECF No. 92.) Defendants filed their

Response on March 6, 2019. (ECF No. 97.) Plaintiffs filed their reply on March 27, 2019. (ECF No. 102.)

Defendants also filed their Motion for Summary Judgment on February 6, 2019. (ECF No. 91.) Plaintiffs filed their Response on March 6, 2019 (ECF No. 99), and Defendants filed their reply on March 27, 2019. (ECF No. 101.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c),

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

When the Court is faced with cross-motions for summary judgment, each motion must be evaluated on its merits and in light of the applicable burdens at the summary judgment stage:

> The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

> \*   \*   \*

> In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185,

1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III. ANALYSIS

### A. Plaintiffs' Constitutional Fabrication of Evidence Claims Against Defendants Stawiasz, Pauch and Wilson

Plaintiffs allege that Defendants Stawiasz, Pauch and Wilson violated Ricks' Fourth Amendment and Fourteenth Amendment constitutional rights by "deliberately and knowingly fabricat[ing] evidence to create probable cause, including the 'positive ID,' to suggest that the bullets from the victim's body had come from the handgun retrieved from Ricks' mother's house, which was material to a finding of probable cause that Plaintiff had committed the crime of murder, and would otherwise have been lacking." (FAC ¶ 93, PgID 381.) Plaintiffs further allege that Defendant Stawiasz "fabricated evidence, in deliberate and knowing fashion, to secure a conviction, including switching the bullets provided to expert, David Townshend[.]" (*Id.*)

Defendants argue that they are entitled to summary judgment on these claims because they did not suppress exculpatory evidence or fabricate evidence, and Plaintiffs argue that they are entitled to summary judgment on these claims against

Defendants Pauch and Wilson because Pauch and Wilson are not entitled to qualified immunity.

### 1. Fabrication of Evidence Claims

"The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."). Lack of probable cause is not an element of a fabrication of evidence claim. *See Stemler*, 126 F.3d at 872 ("A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant.").

### 2. Plaintiffs' Fabrication of Evidence Claim Against Defendants Pauch and Wilson

Defendants argue in their motion for summary judgment that they are entitled to summary judgment on Plaintiffs' fabrication of evidence claim against Pauch and Wilson because Pauch and Wilson did not suppress evidence or hide their findings in their Firearms Identification Report, but instead correctly reported that the Rossi

handgun was classified as a "6R" and that they were only able to see "traces of lands and grooves" on the evidence bullets. (Defs.' Mot. S.J. at p. 26.) Based on this, Defendants argue, Townshend "knew the evidence bullets were deformed" and neither he nor anyone present at trial could have expected to see "pristine" bullets. (*Id.*) Defendants concede that the recent expert opinions "impugn the quality" of Pauch and Wilson's investigation, but contend that there is no evidence that Pauch and Wilson's Firearm Identification Report was "knowingly" or "intentionally" fabricated and, "[a]t worst," "Pauch and Wilson made a mistake in professional judgment," which is insufficient to support a fabrication claim. Without evidence that Pauch and Wilson knowingly and deliberately provided an inaccurate report, Defendants assert that they are entitled to qualified immunity. (*Id.* at p. 27.)

Plaintiffs respond that, when viewed in a light most favorable to Plaintiffs, there is ample evidence that Pauch and Wilson falsified and fabricated the Firearm Identification Report. The recent firearms identification experts have testified that the conclusions independently reached by Wilson and Pauch are wrong and could only be the product of gross incompetence or intentionally done. Wilson and Pauch assert that they are competent and that their conclusions were not the result of a mistake. Thus, Plaintiffs argue, the only conclusion is that the erroneous "Positive ID" was made intentionally. (Pls.' Resp. to Mot. S.J. at pp. 22-23.)

Plaintiffs also argue in their motion for summary judgment that Defendants Pauch and Wilson are not entitled to qualified immunity for Plaintiffs' fabrication of evidence claim. (Pls.' Mot. S.J. at pp. 17-21.) Plaintiffs argue that this false firearm identification report affected the judgment of the jury as evidenced by both Pauch's trial testimony that the match between the evidence bullets and the bullets test-fired from the Rossi handgun were like a "fingerprint" and that "[t]hese bullets were fired from this weapon and no other weapon," and by prosecutor Ken Simon's closing statements, including that the gun was "the most powerful evidence in this case." (*Id.* at 19.) Plaintiffs further argue that Ricks' right to be free from fabrication of evidence was clearly established in 1992. (*Id.*)

### a. The Pauch & Wilson Firearm Identification Report's conclusion is wrong

Pauch and Wilson's March 5, 1992 Report classified the Rossi gun as "class 6R" and concluded that:

> A microscopic comparison of the test shots from weapon on ET#923423 against the fired evidence on Tag#s 923409, 923410 yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon.

(Pauch & Wilson Firearms Id. Rpt. (capitalization in original).) However, the Wayne County Circuit Court granted Ricks' Successive Motion for Relief from Judgment, which eventually resulted in the dismissal with prejudice of all charges against Ricks, because the Molnar Report "contradicts the conclusion reported by

DPD" in the Pauch & Wilson Firearms Identification Report, and thus "undermines the reliability of the firearms evidence used to convict Defendant" and thus "Defendant must be given a new trial." (Stip'd Order Granting Def.'s Successive Mot. for Relief, Conclusion ¶¶ 1-4.)

Dean Molnar of the Michigan State Police, defense expert Jay Jarvis and Plaintiffs' experts David Balash and David Townshend have all since examined the evidence bullets recovered from Bennett's body and determined that the bullets indisputably have <u>five</u> lands and grooves with a right twist and are thus classified as "class 5R." (Molnar May 2017 Corrected Report; Jarvis Official Report; Balash Dep. at pp. 100-01; Townshend 6/16/18 Report at p. 2.) The experts all testified that the evidence bullets could not have been fired by the Rossi handgun. (Molnar Dep. at p. 31; Jarvis Dep. at p. 45; Balash Dep. at pp. 100-01; Townshend 6/16/18 Report at p. 2.)

There is therefore overwhelming evidence that the conclusion reached in the Pauch & Wilson Firearms Identification report that the evidence bullets were fired from the Rossi handgun is wrong. In fact, Pauch now admits that because the Rossi handgun is class 6R, the evidence bullets (since classified as class 5R) were not fired by the Rossi handgun. (Pauch Dep. at p. 102 (Q. So you would agree with me, that gun [the Rossi handgun] could not fire that [evidence] bullet? A. That's right, sir.").) Thus, it is undisputed that the conclusion in the Pauch & Wilson Firearms

Identification Report, identifying the evidence bullets as being fired by the Rossi handgun, is inaccurate or false.

### b. Whether the erroneous conclusion was negligent or intentional is a question of fact

The parties agree that the key issue here is whether Pauch and Wilson knowingly or intentionally provided false or inaccurate information in their report, or whether their error can be more readily classified as a mistake, or merely negligent. *See Gregory*, 444 F.3d at 737 (requiring a showing that "evidence is knowingly fabricated"). Plaintiffs argue that because "[i]t is undisputed that the bullets from the victim's body do not match Desmond Ricks' gun …, the inquiry shifts to whether the Defendants' incorrect result was the product of negligence or intent." (Pls.' Mot. S.J. at p. 17.) Defendants similarly argue that "[e]ven if [Pauch and Wilson's] conclusions may have been inaccurate, there is no evidence that Pauch and Wilson *knowingly* provided false evidence." (Defs.' Resp. to Mot. S.J. at p. 7.)

According to Plaintiffs, "[b]ased on the testimony of the party defendants and expert witnesses in this case, it is undisputed that Pauch and Wilson's incorrect conclusions were reached intentionally, not by mistake or negligence." (Pls.' Mot. S.J. at p. 17.) Specifically, Plaintiffs point to Wilson's and Pauch's responses in their depositions and to requests to admit in which they assert they are competent and well-trained. (*Id.* at p. 15, citing Pauch Dep. at pp. 43, 108; Wilson Dep. at pp. 18-19, 46-47; Defs.' Resp. to RFAs at ECF Nos. 92-29, 92-30.) Plaintiffs further

assert that Wilson and Pauch have both stated that their conclusions in the Firearms Identification Report were not the result of a mistake or negligence, and Pauch testified that his decision to write "Positive ID" on the report was intentional. (Pls.' Mot. S.J. at p. 17, citing Wilson Dep. at pp. 67-68 ("We didn't make any mistakes"); Pauch Dep. at p. 146 (admitting it was his intentional choice to write "positive ID" on the report and testify that the bullets matched the gun "like a fingerprint").)  In addition, Plaintiffs' firearms toolmark experts, Balash and Townshend, both testified that the conclusions independently reported by Pauch and Wilson could only be the product of gross incompetence or intentionally done (Pls.' Mot. S.J. at pp. 17-18, citing Balash Dep. at pp. 67-68; Townshend Dep. at p. 233), and Defendants' own firearms toolmark expert Jarvis testified that he would not expect any competent expert to come to the same conclusion as Pauch and Wilson, which conclusion could only be deemed intentional if the examiners were competent. (*Id.* citing Jarvis Dep. at pp. 57-58.)  Thus, Plaintiffs conclude, "the false 'Positive ID' was made intentionally." (*Id.* at p. 18.)

In support of their motion for summary judgment, Plaintiffs rely on *Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017), a case in which the plaintiff claimed that the forensic expert "falsified the [DNA] report and data to make the DNA from the underwear appear consistent with Mills's own." *Id.* at 484.  According to Plaintiffs, "the *Mills* court noted that the defendant forensic investigator, Jenkins, claimed she

had not made a mistake, which supported an inference that her results were intentionally falsified." (Pls.' Mot. S.J. at p. 16, citing *Mills*, 869 F.3d at 482 ("If the DNA clearly exonerated Mills and Jenkins did not make a mistake, then it is plausible that she intentionally misidentified the DNA in order to support the prosecution.").) The *Mills* court went on to find that "the knowing requirement of fabrication-of-evidence claims is satisfied for the same reason as in the malicious-prosecution claim: according to the complaint, the DNA results [] provided by Jenkins were unmistakably exonerating but Jenkins chose to report that they were consistent with Mills's liability in order to support the prosecution's case and a guilty verdict." *Mills,* 869 F.3d at 485. However, *Mills* involved a motion to dismiss, not a motion for summary judgment, and thus the *Mills* court's finding of "plausibility" based solely on allegations in a complaint, which allegations the court was required to accept as true, does not necessarily meet the finding necessary here on summary judgment, that Plaintiffs have provided evidence that Defendants Pauch and Wilson "knowingly fabricated evidence."

Defendants counter that Plaintiffs have failed to provide any evidence of intentional fabrication, but rather are simply asking the Court to *infer* the knowing requirement from the inaccuracy of the report. (Defs.' Resp. to S.J. at p. 7.) Defendants state that both Pauch and Wilson testified that their conclusions were based on a comparison of the Bennett evidence bullets to the test-fired bullets from

the Rossi handgun. (*Id.* at p. 6.) They further point out that the recent experts, who opined that the evidence bullets are classified as 5R and thus could not have been fired from the Rossi handgun, classified as 6R, did not have an opportunity to compare test shots fired by the gun to the evidence bullets because the Rossi handgun and the Pauch test bullets had been destroyed by the Michigan State Police in 2001, and thus they "cannot legitimately question the conclusions of Pauch, Wilson and Townshend (in 1992), and there is no admissible evidence that Pauch or Wilson fabricated any evidence." (*Id.* at pp. 6-7.) Defendants argue that even if Pauch's and Wilson's conclusions are inaccurate, there is no evidence that they *knowingly* provided false evidence. (*Id.* at p. 7.)

Defendants direct the Court to *Caminata v. County of Wexford*, 664 F. App'x 496 (6th Cir. 2016) to support their argument. In *Caminata*, a suspicious house fire was separately investigated by a county fire investigator and a State Police fire investigator. *Id.* at 498. Michael Jenkinson, the State Police examiner, conducted an investigation and drafted two reports. *Id.* He first conducted a reconstruction of the chimney's since-collapsed wood frame ("the board reconstruction") and determined that the chimney's thimble hole had been covered by a wood board, which was not fire-damaged, thus concluding that a chimney fire was an unlikely cause of the house fire. *Id.* Jenkins concluded in his supplemental incident report

that the fire was caused by arson.  *Id.*  Caminata was convicted of arson and sent to prison.  *Id.*

The University of Michigan Innocence Clinic subsequently secured Caminata's release through undermining Jenkinson's board reconstruction.  *Id.* at 498-99.  The Innocence Project alleged that Jenkinson's board reconstruction was done improperly, and that he incorrectly analyzed the isolated pockets of burning wood, and Caminata's motion for relief from judgment was subsequently granted. *Id.* at 499.

Caminata then filed a civil suit alleging fabrication of evidence and malicious prosecution.  The Sixth Circuit affirmed a grant of summary judgment for defendant Jenkinson on both counts, finding that "although Jenkinson's investigation and conclusions may have been flawed, there is no evidence to suggest that his report contained deliberate omissions or reckless falsehoods."  *Id.* at 501.  The court noted that "Caminata's primary evidence supporting his claims is expert testimony characterizing aspects of Jenkinson's investigation as 'huge mistakes' that would not be expected of someone with his level of experience," but "[a]lthough this testimony impugns the quality of Jenkinson's investigation, it is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence."  *Id.* at 501.

In reaching its holding, the *Caminata* court distinguished *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), relied on by Plaintiffs here, a case involving a forensic examiner's inaccurate report regarding the number of hairs the examiner recovered from the scene of a rape and whether any of those hairs "matched" the plaintiff. Although the examiner testified that she had "found five hairs," and that these hairs matched the plaintiff's hair, a later deposition revealed that the examiner had actually recovered seven hairs, two of which were non-matching, but she omitted that fact from her report. *Id.* at 732, 734. In addition, the plaintiff's expert testified that the examiner's findings of a match were "far afield of what any reasonable forensic examiner would find from the evidence[.]" *Id.* at 744. The court concluded that summary judgment was inappropriate because a reasonable jury could conclude that the examiner "deliberately withheld the existence of those two nonmatching hairs" and "fabricated her report." *Id.* Thus, the *Caminata* court found that *Gregory* did not arise from a "flawed investigation" but rather from the investigator knowing there were seven hairs but choosing to report only five. *Caminata*, 664 F. App'x at 500.

According to Defendants, Plaintiffs make essentially the same arguments here that the plaintiff did in *Caminata*, relying almost exclusively on expert testimony to attack the reliability of the firearms toolmark examination performed by Pauch and Wilson. Defendants argue, however, that there is simply no evidence of *intentional*

fabrication in this case because Pauch and Wilson accurately reported that the Rossi gun was classified as a 6R and provided this evidence to the prosecutor, to Ricks' counsel and expert witness Townshend, and introduced that finding into evidence at trial. Pauch and Wilson also reported that they were only able to see "traces of lands and grooves" on the evidence bullets, and Defendants note that Molnar similarly initially stated that he was unable to count the number of lands and grooves and thus his initial finding was inconclusive. Defendants argue that Plaintiffs' experts' opinions impugning the quality of Pauch and Wilson's investigation is "insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence." (Defs.' Resp. to S.J. at p. 10, citing *Caminata*, 664 F. App'x at 501.) Rather, Defendants argue that "the record in this case at worst shows that Pauch and Wilson negligently investigated the firearms toolmarks, but such a conclusion 'does not establish a constitutional violation." (*Id.*) *See also Seigel v. City of Germantown*, 25 F. App'x 249, 250 (6th Cir. 2001) ("The facts in this case supported at most a finding of incompetent or negligent investigation, which is insufficient to establish a constitutional violation.").

The Court finds the Sixth Circuit's decision in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) instructive. In that case, Gregory was arrested and convicted on charges of rape, attempted rape and burglary, based in part on a report by Dawn Katz, an Examiner with the Kentucky State Police Crime Laboratory, who

examined hairs found in pantyhose that one victim's attacker had worn as a mask during a rape. *Id.* at 732. Katz's records noted "5 HHs" (head hairs) that were found to be similar in color and microscopic characteristics to Gregory's hair. *Id.* Katz's later deposition revealed that she actually found seven head hairs in the pantyhose, only five of which she found similar to Gregory's. *Id.* Later DNA tests established that in fact *none* of the hairs recovered from the pantyhose came from Gregory, and all charges were dismissed (after Gregory had spent more than seven years in custody). *Id.* at 735.

Gregory then brought a lawsuit under § 1983 against various members of the investigatory team, including Katz. Gregory alleged, in part, that Katz "knowingly withheld the existence of two 'non-matching' head hairs from the recovered pantyhose, or in the alternative, that she withheld knowledge that none of the hairs 'matched.'" *Id.* at 744. Gregory's experts opined that Katz's findings that Gregory's hairs "matched" the hairs in the pantyhose "are far afield of what any reasonable forensic examiner would find from the evidence" and the court found that "this is sufficient evidence from which jury might reasonably infer that Katz fabricated her report." *Id.* at 744 & n.8, 9 (noting that Gregory's experts opined "that the evidence presented to Katz for analysis does not and could not support the conclusions that Katz reached" and "provide[d] proper testimony as to what a reasonable forensic examiner would do with hair examinations and an expert assessment of the evidence

presented to Katz"). The Court noted that "Katz's sole argument for qualified immunity … is that her 'failure to disclose [the other two hairs],' if any, amounts only to negligence." *Id.* The Sixth Circuit found that "Katz's culpability [regarding this claim] is an issue of fact for a jury." *Id.* Katz similarly argued that her opinion that the five found hairs "matched" Gregory's head hair is "at most … only a negligent performance of her duties." *Id.* at 744. The Sixth Circuit explained that "[b]y arguing that the evidence establishes at most a negligent performance of her duties, Katz is arguing disputed issues of fact to this Court." *Id.* at 744-45.

Here, as in *Gregory*, both Plaintiffs' and Defendants' experts have offered opinion evidence "that the evidence presented to [Pauch and Wilson] for analysis does not and could not support the conclusions that [they] reached" and have provided testimony "as to what a reasonable [firearms toolmarks expert] would do with the [evidence bullets] and an expert assessment of the evidence presented to [Pauch and Wilson]." *See Gregory*, 444 F.3d at 745 n.9.

Pauch and Wilson's Firearm Identification Report's conclusion that the evidence bullets were a "Positive ID" with the Rossi handgun has not simply been "impugned," as the expert report was in *Caminata*, but rather has been indisputably shown to be wrong. Plaintiffs have shown more than a mere "professional disagreement" or "good faith difference of opinion" among experts, as was found to be insufficient to sustain a fabrication of evidence claim in *Ferris v. City of Cadillac*,

726 F. App'x 473 (6th Cir. 2018). In *Ferris*, defendant medical examiners and forensic pathologists opined that a child's death was homicide rather than accidental, which led to Ferris' continued detention on murder charges, which were eventually dropped. *Ferris*, 726 F. App'x at 475-77. Ferris subsequently brought suit against the examiners under 42 U.S.C. § 1983, and the parties filed cross-motions for summary judgment. Ferris argued that the defendants' opinions were recklessly made and supported his motion with two expert opinions that the child's death could not be determined (although the reports did not go as far as to opine that the death should be classified as "accidental"). *Id.* 477-78. The Court granted summary judgment in favor of the defendants, finding that Ferris's evidence "evinces nothing more than a professional disagreement over what conclusions can properly be drawn from the medical evidence; what the evidence does not do is support the assertion that Defendants fabricated evidence." *Id.* at 483.

Thus, drawing all reasonable inferences in favor of Plaintiffs, Plaintiffs have established that there is a question of fact as to whether Pauch and Wilson "intentionally" or, at least, "recklessly" falsified or fabricated the conclusion in their report sufficient to defeat Defendants' motion for summary judgment. As in *Gregory*, "[Pauch and Wilson's] culpability is an issue of fact for a jury" *See Gregory*, 444 F.3d at 744-45 ("By arguing that the evidence establishes at most a

negligent performance of her duties, Katz is arguing disputed issues of fact to this Court.").

However, Plaintiffs have failed to meet their burden, on their motion for summary judgment, to conclusively establish this claim against Defendants Pauch and Wilson – a fact issue remains – and therefore Plaintiffs' motion for summary judgment is denied. *See Ely*, 150 F.Supp.3d at 849-50.

### c. Whether Pauch & Wilson's Report affected the judgment

To establish their fabrication of evidence claim, Plaintiffs must also demonstrate that the false evidence could have affected the judgment. *See Gregory*, 444 F.3d at 737 ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated *and* a reasonable likelihood exists that the false evidence would have affected the decision of the jury.") (emphasis added).

In support of this prong, Plaintiffs point to Pauch's trial testimony, in which he describes his qualifications and experience as an expert witness in firearms identification and his testimony that the evidence bullets were like a "fingerprint" and that "[t]hese bullets were fired from this weapon [the Rossi handgun] and no other weapon." (Pls.' Mot. S.J. at pp. 18-19, citing ECF No. 92-9, Pauch's Trial Test. at pp. 49, 52-53.) Plaintiffs also rely on the prosecutor's closing argument, in which he emphasized that there is but one "inescapable fact" that Ricks' gun

matched the bullets from the victim, that "[t]he gun speaks louder than any eye witness could about what happened on March 3rd," and that the gun was "the most powerful evidence in this case." (Pls.' Mot. S.J. at p. 19, citing ECF No. 92-18, Simons' Closing Arg. at pp. 107, 109, 112, 129, 143.) Plaintiffs argue that the fabricated evidence – that the evidence bullets matched the Rossi handgun – was central to the case and readily "could have affected the judgment."

Defendants do not address this argument in their response brief or in their motion for summary judgment, for good reason. They cannot make a good faith argument that Pauch and Wilson's firearms identification report, and Pauch's testimony at the trial consistent with that report, did not significantly affect the judgment. Accordingly, Defendants' motion for summary judgment on Plaintiff's fabrication of evidence claims against Pauch and Wilson is denied.

### d. Qualified immunity analysis

Defendants Pauch and Wilson argue they are entitled to the defense of qualified immunity, and Plaintiffs argue that they are not. Plaintiffs bear the burden of demonstrating that the Defendants are not entitled to qualified immunity. *Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007). The Sixth Circuit recently explained:

> Responding to the many and varied suits brought under § 1983, the judiciary recrafted that limited version of the doctrine of qualified immunity in an effort to protect public officials "from undue interference with their duties and from potentially disabling threats of

liability." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S. Ct. 1019, 127 L.Ed.2d 344 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). We therefore no longer "attempt[ ] to locate [the qualified immunity] standard in the common law as it existed in 1871," *Ziglar v. Abbasi*, —— U.S. ——, 137 S. Ct. 1843, 1871, 198 L.Ed.2d 290 (2017) (Thomas, J., concurring), but instead attempt to determine whether a defendant, by his conduct, "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S. Ct. 2727.

*Jackson v. City of Cleveland*, 925 F.3d 793, 822 (6th Cir. 2019).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff has shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Phillips v. Roane County, Tenn*., 534 F.3d 531, 538-39 (6th Cir. 2008). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. at 223, 236 (2009). All facts and factual inferences are drawn in favor of the nonmovant. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). If multiple officers are alleged to have violated a plaintiff's constitutional rights, each officer's conduct must be analyzed individually. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)).

The Sixth Circuit has adopted the following familiar analysis for determining whether a right is clearly established:

> For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (citing *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151). Thus, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

> "We look first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was

clearly established when the action complained of occurred." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citing *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993)). "[T]he case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.' " *Id.* (quoting *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997)). Plaintiffs bear the burden of showing the claimed right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

*Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012). "'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Flying Dog Brewery, LLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 353 (6th Cir. 2015) (quoting *al-Kidd*, 131 S. Ct. at 2083). The inquiry requires the Plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" to demonstrate that the right was clearly established. *Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013).

As discussed above, there is a question of material fact as to whether Defendants Pauch and Wilson knowingly or intentionally fabricated evidence, thus defeating the first prong of Defendants' qualified immunity defense. However, Plaintiffs have not conclusively established this claim so that they would be entitled to a directed verdict at trial.

With regard to the second prong of the qualified immunity analysis, "whether the right at issue was "clearly established" at the time of defendant's alleged

misconduct" *Pearson*, 555 U.S. at 232 (citations omitted), Plaintiffs argue that a criminal defendant's right to be free from prosecution based on fabricated evidence existed before 1992. (Pls.' Mot. S.J. at p. 21, citing *Miller v. Pate*, 386 U.S. 1, 7 (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle. There can be no retreat from that principle here.") (internal citations omitted); *Spurlock v. Satterfield*, 167 F.3d 995, 1006-07 (6th Cir. 1999) ("a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful" in April of 1990, when the defendant's fabrication occurred).).

Defendants do not attempt to argue otherwise. The Sixth Circuit previously stated that "[u]nder law that was clearly established in 1992, [the defendant] would have violated Plaintiff's constitutional rights if [he] 'knowingly fabricated evidence against [him], and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *See Gregory*, 444 F.3d at 744 n.8. Thus, because there remains a question of material fact as to whether Defendants Pauch and Wilson knowingly or intentionally fabricated evidence, Defendants Pauch and Wilson have failed to establish that they are entitled to qualified immunity on Plaintiffs' fabrication of evidence claim.

### 3. Plaintiffs' Fabrication of Evidence Claim Against Defendant Stawiasz

Plaintiffs allege that Defendant Stawiasz "further fabricated evidence, in deliberate and knowing fashion, to secure a conviction, including switching the bullets provided to expert, David Townshend, which was material to the jury's decision that Plaintiff had committed the crime of murder, and which otherwise would have been lacking." (FAC ¶ 93, PgID 381.) Specifically, Plaintiffs allege that Stawiasz switched the evidence slugs from Bennett's body with the test-fired bullets from the Rossi handgun and marked the test-fired bullets as Evidence Tags 923409 and 923410 when he transported the slugs and gun to Townshend for testing on August 16, 1992. (*Id.* ¶ 68, PgID 372.)

Defendants argue in their Motion for Summary Judgment that Defendant Stawiasz did not suppress exculpatory evidence by withholding the evidence bullets from the prosecutor or fabricate evidence by knowingly giving "pristine" bullets to Townshend for examination. (Defs.' Mot. S.J. at p. 23.) They argue that there is no evidence that Stawiasz knowingly and intentionally gave the wrong bullets to Townshend for examination in 1992, and that Plaintiffs "have no evidence that the bullets were switched, who did it, when, where or how it was done." (*Id.* at pp. 23-24.) According to Defendants, Townshend, Kanluen and Pauch all examined the evidence bullets during the trial and agreed that those were the bullets they had

previously examined, and Townshend never complained in 1992 that the bullets were "near pristine." (*Id.* at pp. 24-25.)[3]

Plaintiffs respond that the evidence, viewed in the light most favorable to them, can lead to the reasonable inference that Stawiasz tampered with the evidence and provided Townshend with the wrong bullets for examination in 1992 (the test-fired bullets from the Rossi handgun instead of the evidence bullets recovered from Bennett). (Pls.' Resp. to S.J. at p. 23.) The evidence bullets have now been indisputably classified as "5R" and thus cannot have been fired by the Rossi handgun, classified as "6R." (*Id.*) Plaintiffs argue that Townshend recalls the bullets he examined in 1992 as being almost pristine, but that, when questioned, Stawiasz assured him they were the evidence bullets. (*Id.* at p. 24.) According to Plaintiffs, Stawiasz had the means and the opportunity to swap out the evidence bullets (which

---

[3] Defendants, seemingly tacitly acknowledging that Townshend did not examine the actual "evidence bullets" in 1992, posit in their motion that:

> The mere fact that Townshend stated [in July 2018 that] the bullets he examined [in 1992] were "pristine" does not necessarily mean that he did not have possession of the evidence bullets. Instead of comparing those evidence bullets in evidence folders #923409 and #923410, however, he may have mistakenly compared Pauch's test bullets in evidence folder #923423 to his own test shots.

(*Id.* at 25.) However, Townshend testified that there were no "test-fired bullets" in the envelopes provided to him in 1992, as reflected in his draft report (Townshend Dep. at pp. 129-30; ECF No. 91-75, Townshend Draft of Firearms Id. Rpt.), only what were purported to be the "evidence bullets."

were kept in manila envelopes sealed with nothing more than a string tie) with the previously test-fired bullets when he alone delivered them to Townshend in 1992. (*Id.* at pp. 24-25, citing Stawiasz Dep. at p. 123.)

### a. Analysis of fabrication claim

As explained above, "[t]he basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills*, 869 F.3d at 484.

Defendants argue that there is no evidence that any person in the chain of evidence switched the bullets, much less evidence that Stawiasz did so, and that Plaintiffs instead rely on only speculation and conjecture that Stawiasz had the "means and opportunity" to do so. Plaintiffs argue in response that Townshend averred in his sworn affidavit that the bullets he examined in 1992 are not the same bullets he examined in 2018. It is undisputed that Stawiasz is the person who transported those bullets to Townshend in 1992, and thus he had "means and opportunity" to switch the bullets. Indeed, Stawiasz conceded in his deposition that he had both the means and the opportunity to switch the evidence bullets with the bullets test-fired from the Rossi handgun by Defendants Pauch. (Stawiasz Dep. at pp. 123, 125, 127.) Townshend testified that he remembers remarking to Stawiasz, during the examination of the bullets in 1992, that the bullets looked undamaged,

but that Stawiasz assured Townshend that the bullets he was examining were in fact the evidence bullets. (Townshend Dep. at pp. 115, 127.) And, Defendants concede that Townshend might have examined the previously obtained "test" bullets instead of the actual evidence bullets in 1992. (Defs.' Mot. S.J. at 25.)

Viewing all of this evidence in the light most favorable to Plaintiffs, although a jury might ultimately find that Stawiasz did not switch the evidence bullets with the test-fired bullets from the Rossi handgun when he brought them to Townshend for testing in 1992, it would not be unreasonable in finding that he had. And as explained above, there is more than a reasonable likelihood that this fabricated bullet evidence "could have affected the judgment." Thus, a fact question remains, and Defendants are not entitled to summary judgment on Plaintiffs' fabrication of evidence claim against Defendant Stawiasz.

### B. Plaintiff's Constitutional Malicious Prosecution Claims Against Defendants Stawiasz, Pauch and Wilson

Plaintiffs allege that Defendants Pauch and Wilson "influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly supplied false information (that the bullets from Gerry Bennett's body matched Ricks' gun) that was relied upon by the prosecutor in bringing criminal charges, and was material to a finding of probable cause that Plaintiff had committed the crime of murder, which otherwise would have been lacking," in violation of the Fourth Amendment. (FAC ¶ 93, PgID 381.) Plaintiffs also claim that Defendant Stawiasz

"influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false evidence by switching bullets to be provided to David Townshend, and supplied false information and omitted material information which showed a reckless disregard for the truth in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause."  (*Id*.)

### 1. Malicious Prosecution

"The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction and incarceration.'"  *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709 715-16 (6th Cir. 2006) (internal quotation marks omitted)).  "To succeed on a Fourth Amendment malicious prosecution claim … a plaintiff must prove the following: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor."  *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014).  Although actual "malice" is not required to succeed on a constitutional malicious prosecution claim, the

defendant's participation "must be marked by some kind of blameworthiness," i.e., the defendant must have made "deliberate or reckless falsehoods," and "mere negligence" will not create liability. *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). A police officer violates a person's clearly established right to be free from malicious prosecution when the officer's "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014); *see also Robertson*, 753 F.3d at 617 ("Allegations of negligence or innocent mistake are insufficient.").

## 2. Plaintiffs' Malicious Prosecution Claims Against Defendants

The third and fourth prongs of a constitutional malicious prosecution claim are not meaningfully in dispute in this case, as Ricks clearly suffered a deprivation of liberty when he was incarcerated for 25 years, and the criminal proceeding against him was ultimately resolved in his favor. Thus, at issue here are prongs one and two – whether Defendants influenced or participated in the decision to prosecute Ricks (the "participation" prong) and whether there was probable cause for the prosecution (the "no probable cause" prong).

### a. The "participation" prong

The first element of the malicious prosecution claim is met when an officer "could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty" and the misconduct actually does so.

*Sykes*, 625 F.3d at 316. The term "participated" is construed "within the context of tort causation principles." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (quoting *Sykes*, 625 F.3d at 311). "Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials … ultimately influenced [a plaintiff's] continued detention." *Sykes*, 625 F.3d at 316. "[T]he fact that [Defendants] did not *make* the decision to prosecute does not per se absolve them from liability." *Id.* (emphasis in original). "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge or otherwise 'ultimately influenced [a plaintiff's] continued detention,' and (2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth." *Meeks v. City of Detroit, Mi.*, 727 F. App'x 171, 178-79 (6th Cir. 2018) (internals citations omitted).

Defendants do not directly address this prong in their motion for summary judgment. However, a reasonable jury could find that Defendants' misconduct influenced the decision to bring charges against Plaintiff. Plaintiffs assert that the evidence in this case "undeniably demonstrates that the bullet evidence from Pauch and Wilson 'influenced' or 'participated' in the initiation of the prosecution and the continuation of detention." (Pls.' Resp. to SJ at pp. 26, PgID 5250.) And, Stawiasz, as the officer in charge, was also involved in the initiation and prosecution of this

case. Plaintiffs cite *Mills, supra*, for the proposition that "[t]he prototypical case of malicious prosecution involves an official who fabricates evidence that leads to wrongful arrest or indictment of an innocent person." (*Id.* citing *Mills*, 869 F.3d at 480.)

Plaintiffs have provided evidence that the bullet evidence 'influenced' or 'participated' in the initiation of the prosecution and the continuation of detention. In this case, Pauch testified at the Preliminary Examination hearing, in support of the prosecution, that the two bullets recovered from Bennett's body had been fired from Ricks' gun. (ECF No. 92-31, Pauch Prelim. Exam. Test., 3/19/92 at p. 39.) Plaintiffs also contend that "[b]ut for [Wilson's] knowing fabrication of evidence, there would have been no agreement on the test results, which would have destroyed probable cause for Stawiacz [sic] to seek an arrest warrant." (Pls.' Resp. at p. 28, PgID 5252.) And Defendant Stawiasz, as the officer in charge, also plainly participated in the initiation of the prosecution and continuation of detention of Ricks.

Plaintiffs' claim of malicious prosecution against Pauch and Wilson is predicated on the conclusion in their Firearms Identification Report that there is a "Positive ID" between the Rossi handgun and the evidence bullets, and their claim against Defendant Stawiasz is predicated on the allegations that he switched the evidence bullets provided to Townshend. Defendants ignore that the "short analysis

of the evidence bullets," as they put it, played a significant role in Ricks' continued detention. *See Sykes*, 625 F.3d at 316-17; *Gregory*, 444 F.3d at 749-50. Prosecutor Simon agreed that "[t]he bullets were that critical to the case" and testified that if he knew the true evidence – that the evidence bullets did not match the Rossi handgun – he is "not sure there would never have been a case getting past exam, but [he] do[es]n't think there would have been a trial." (Simon Dep. at 9, PgID 3820.)

A reasonable juror could find that this evidence, and Pauch and Stawiasz's trial testimony regarding the bullet evidence, influenced the decision to prosecute Ricks. *See Sykes*, 625 F.3d at 317 (finding that "a reasonable jury could have found that Sgt. Anderson participated in or influenced the decision to prosecute the Plaintiffs such that liability for malicious prosecution is proper" because the officer's investigatory materials were in the prosecutor's possession and he relied on many of the falsehoods in proceeding against the plaintiffs). While Defendants did not make the decision to prosecute Ricks, it is reasonable to infer that the bullet evidence – which the prosecutor agreed was "critical" - influenced the decision to bring charges against Ricks. As the *Sykes* court explained, "[i]n short, the fact that Sgt. Anderson did not *make* the decision to initiate the criminal proceedings against the Plaintiffs is of no moment, as the record contains ample evidence that Sgt. Anderson influenced or participated in the ultimate decision to prosecute the Plaintiffs by way of his knowing misstatements to the prosecutor." *Sykes*, 625 F.3d at 317; *see also*

*Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.").

### b. The "probable cause" prong

Defendants argue that re-litigation of probable cause is foreclosed because probable cause was determined at the preliminary examination hearing. *See Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) ("Where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose re-litigation of that finding in a subsequent § 1983 action."). However, "[i]t is well established in this circuit that '[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause [to absolve them of liability] when that determination was premised on an officer's own material misrepresentations to the court.'" *Sykes*, 625 F.3d at 312 (quoting *Gregory*, 444 F.3d at 758). Thus, to establish that Defendants were responsible for commencing a criminal proceeding for purposes of a malicious-prosecution claim, Plaintiffs must present evidence that Defendants "(1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that the allegedly false or omitted information was material to the [court's] finding of probable cause." *Id*.

As discussed above, Plaintiffs have raised a material question of fact as to whether Defendants Pauch and Wilson intentionally or deliberately falsified their Firearms Identification Report and as to whether Defendant Stawiasz switched the evidence bullets provided to Townshend for examination. The issue then is whether this false or omitted information was material to the finding of probable cause. *Sykes*, 625 F.3d at 312. According to Plaintiffs, Stawiasz testified that probable cause was lacking until the bullet evidence came back positive for a match to Desmond Ricks' gun. (Stawiasz Dep. at pp. 116-17.) Pauch testified at the Preliminary Exam in support of the prosecution that the two bullets recovered from Bennett's body had been fired from Ricks' Rossi handgun. (Prelim. Exam. Tr., Pauch Testimony at p. 39.) And, Prosecutor Simon stressed at the Preliminary Examination that "the strongest piece of circumstantial evidence is that the gun that was used to kill the deceased, Gerry Bennett, came from the house where the Defendant lived." (Prelim. Exam. Tr., Simon Closing at p. 42.) And, as stated above, Prosecutor Simon later testified that if he knew the true evidence – that the evidence bullets did not match the Rossi handgun – he is "not sure there would never have been a case getting past exam, but [he] do[es]n't think there would have been a trial." (Simon Dep. at 9.) A reasonable jury could therefore find that the bullet evidence was therefore material to the ultimate prosecution of Ricks.

Defendants argue that there was sufficient other evidence supporting probable cause for Ricks' arrest and prosecution. While Ricks' coat was found at the scene, it is well-settled that "mere presence [at the crime scene] is not sufficient to meet the probable-cause threshold." *Sykes*, 625 F.3d at 307-08 (citing *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008) ("[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest.")). Defendants argue that there was sufficient probable cause without the Pauch & Wilson Firearms Identification Report, contending that it played only a "limited" or "smaller" role in the prosecution. (Defs. Resp. to S.J. at pp. 15-16.) However, the Court finds that this argument presents a question of fact as to whether an accurate report might have resulted in a conclusion that there was insufficient evidence of probable cause, defeating Defendants' motion for summary judgment. *See Gregory*, 444 F.3d at 749 n.11 ("It is not our job to find whether or not probable cause would have been dissolved had Katz revealed the exculpatory evidence; this is the precise province of the jury.").

### c. Qualified immunity

For the reasons explained above, Plaintiffs' have established a question of material fact as to their malicious prosecution claims against Defendants, thus satisfying the first prong of the qualified immunity analysis. However, Plaintiffs have not conclusively established this claim so that they would be entitled to a

directed verdict at trial and thus they are not entitled to summary judgment in their favor on this claim. With regard to the second prong, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct," *Pearson*, 555 U.S. at 232 (citations omitted), Plaintiffs argue that the right to be free from illegal seizure resulting from knowingly false statements or those made with reckless disregard for the truth was clearly established by March of 1992. (Pls.' Mot. S.J. at p. 26, citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *see also Pyle v. Kansas*, 317 U.S. 213, 216 (1942) (knowing use of false testimony to obtain conviction violates Fourteenth Amendment); *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (same).)

Defendants do not attempt to argue otherwise. Thus, Defendants' motion for summary judgment on Plaintiffs' malicious prosecution claim against Defendants based on qualified immunity is denied.

### C. Plaintiffs' Constitutional *Brady*-Derived Claims Against Defendants Stawiasz and Pauch

Plaintiffs claim that Defendants Stawiasz and Pauch "were under an unwavering legal duty ("*Brady*" duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, including, but not limited to, the evidence that they fabricated the test results to state that the examination "*yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon*," when, in fact, the bullets did not match the Rossi .38 Special

caliber revolver." (FAC ¶ 90, PgID 379; *see also id.* ¶ 93, PgID 381, **_Brady_**

**_Violations_**.)[4]

### 1. *Brady* Claims

A *Brady* claim has three elements: "[1] The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching;

[2] that evidence must have been suppressed by the State, either willfully or

inadvertently; and [3] prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668,

691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "Reversal

is only required … where 'there is a "reasonable probability" that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine the confidence in

the outcome.'" *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994)

(citations omitted).

Police officers are obligated to turn over potentially exculpatory evidence to

the prosecutor's office. *Moldowan v. City of Warren*, 578 F.3d 351, 378-79 (6th Cir.

2009). However, a police officer need only disclose evidence "when its exculpatory

---

[4]Plaintiff does not allege a claim for a *Brady*-derived violation against Defendant
Wilson. (FAC ¶ 93, PgID 381 (alleging only that "Defendants, STAWIASZ and
PAUCH" engaged in "conduct constituting a claim for a "*Brady* violation" under the
Fifth Amendment); *see also* Pls.' Mot. S.J. at 26 (arguing only that Plaintiffs' *Brady*-
derived claim against Defendant Pauch warrants summary judgment).)

value is 'apparent' to the officer, that is, when the officer is aware that the evidence 'could form a basis for exonerating the defendant.'"  *D'Amborsio v. Marino*, 747 F.3d 378, 389-90 (6th Cir. 2014) (internal citations omitted) (quoting *Moldowan*, 578 F.3d at 384, 388 n.14).  Bad faith is not required where "materially exculpatory" evidence has been withheld, regardless of whether the claim involves a failure-to-preserve, or failure-to-disclose evidence.  *Moldowan*, 578 F.3d at 385.  In such an instance, "where the evidence withheld or destroyed by the police falls into that more serious category [materially exculpatory evidence], the [criminal] defendant is not required to make any further showing regarding the mental state of the police." *Id.* at 386.

### 2. Defendants' Motion for Summary Judgment

In their motion for summary judgment, Defendants argue only that they are entitled to qualified immunity on Plaintiffs' *Brady*-derived claims because "Plaintiffs cannot identify any controlling authority establishing a *Brady* obligation imposed on officers acting under similar circumstances – delivering the wrong evidence or providing an incorrect firearms identification conclusion *to a retained defense expert*" (possibly referring to Townshend).  (Defs.' Mot. S.J. at pp. 30-31 (emphasis added).)

Contrary to Defendants' contention, Plaintiffs complain in their First Amended Complaint of Defendants' failure to disclose exculpatory/impeachment

evidence *to the prosecutor*, <u>not</u> failure to disclose to such evidence to "a retained defense expert." (*See* FAC ¶¶ 90, 93, PgID 379, 381.) As Plaintiffs correctly state in their response to Defendants' motion, this Court has previously ruled that it was clearly established in 1992 that police officers have a *Brady*-derived obligation to disclose exculpatory evidence. (Pls.' Resp. to S.J. at pp. 28-29, citing ECF No. 41, May 30, 2018 Opinion & Order Denying Defendants' Motion for Partial Judgment on the Pleadings.) Specifically, this Court has already found in this case that it was clearly established in 1992 that police officers had a "*Brady*-derived" obligation to disclose exculpatory evidence, and that Plaintiffs' Complaint plausibly alleges a *Brady*-derived Section 1983 claim "that Pauch and Stawiasz failed to disclose to the prosecutor the existence of the exculpatory bullets that were removed from Bennett's body and also did not disclose that they had fabricated evidence that would inculpate, and indeed was used to convict, Ricks." (May 30, 2018 Opinion & Order at pp. 29-30.)

Defendants motion otherwise fails to justify the grant of summary judgment on this claim. Courts routinely decline to consider perfunctory arguments of the sort made by Defendants here. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (holding that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293 (1st

Cir. 1995))). It is not enough for a party to "mention a possible argument in the most skeletal way" and leave the court to "put flesh on its bones." *Id.* at 995-96 (quoting *Citizens Awareness Network*, 59 F.3d at 293-94). Defendants were obligated to explain why they are entitled to summary judgment, but their brief makes no attempt to do so. But it is not for the court to search the record and construct arguments. Parties must do that for themselves. *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008). Accordingly, Defendants' motion for summary judgment with regard to Plaintiffs' *Brady*-derived claims against Pauch and Stawiasz is denied.

### 3. Plaintiffs' Motion for Summary Judgment

Plaintiffs argue in their motion for partial summary judgment that they are entitled to summary judgment on their *Brady*-derived claim against Defendant Pauch because, even taking the facts in the light most favorable to Defendant Pauch, there is no genuine issue of material fact regarding any of the *Brady* elements. (Pls.' Mot. S.J. at p. 28.)[5] According to Plaintiffs, Pauch violated Ricks' due process rights by withholding that he falsified the bullet evidence report from the prosecutor, Ken Simon, and Simon has testified that if he had known the bullets did not match the gun in 1992, there would have been no trial, and if he had learned of fabricated

---

[5] Plaintiffs do not move for summary judgment on their *Brady*-derived claim against Defendant Stawiasz.

evidence during the trial, "it may have" resulted in a dismissal in the middle of trial. (*Id.* at 28-29.) Plaintiffs further assert that the Court has already recognized that Defendants' "*Brady*-derived" obligation to turn over material exculpatory and impeachment evidence pre-dated March 6, 1992. (*Id.* at p. 29.)

Defendants argue in response to Plaintiffs' motion for summary judgment that Plaintiffs improperly attempt to "bootstrap" their fabrication of evidence claim as a *Brady* claim and that they have no evidentiary basis for their claim that the firearms report was fabricated. (Defs.' Resp. to S.J. at pp. 18-19.) This Court previously addressed, and rejected, this same argument by Defendants and explained that the Sixth Circuit has recognized that a plaintiff can logically plead a *Brady*-derived "withholding of evidence claim" alongside a "fabrication-of-evidence" claim." (May 30, 2018 Opinion & Order at p. 22, citing *Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017).)

Defendants also argue in response to Plaintiff's motion that the issue is "whether the materiality of the allegedly inaccurate firearms report would have been 'apparent' to Officers Pauch and Wilson, given the state of the case at the time." (*Id.* at p. 19.) Defendants contend that it was not "apparent" to Pauch and Wilson that the report was fabricated, as both testified that they did not make an error and believed their report was accurate. (*Id.* at pp. 19-20.) According to Defendants, both Pauch and Wilson deny intentionally making an error or being aware of an error, and

instead testified that they believed their report was accurate. (Wilson Dep. at pp. 73-75 ("So, therefore, the bullets from the body, whether you can determine it or not, were compared against the bullets from the gun. Therefore, that bullet you're claiming, and others are claiming, is a 5-right is a 6-right, and cannot be anything else."); Pauch Dep. at pp. 107-08 (agreed that he made his "Positive ID" determination by matching the various striations on the evidence bullets and the test-fired bullets).) Thus, Defendants argue, Plaintiffs' motion for summary judgment should be denied because there is no evidence that Pauch and Wilson fabricated their findings.

Although this Court has already found that there is a clearly established obligation to turn over apparent exculpatory and impeachment evidence to the prosecutor, as explained above, there is a question of material fact as to whether Defendant Pauch intentionally falsified the Firearm Identification Report and subsequently withheld this information from the prosecutor, thus precluding summary judgment for Plaintiffs on their *Brady* claim against Defendant Pauch.

### D. Common Law Malicious Prosecution

Plaintiffs allege a claim for malicious prosecution under Michigan law. (FAC Count II, ¶¶ 99-108, PgID 383-85.) To succeed on a common law malicious prosecution claim under Michigan law, a plaintiff must prove that:

> [T]he defendant has initiated a criminal prosecution against him, (2) the criminal proceedings terminated in his favor, (3) the private person who

instituted or maintained the prosecution lacked probable cause for his actions, and (4) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Walsh v. Taylor*, 263 Mich. App. 618 (2004). Thus, Plaintiffs must show an absence of probable cause and must show "malice." *Newman v. Township of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014). "That requires evidence that the officer 'knowingly sw[ore] to false facts … without which there is no probable cause,' a standard more than establishing mere recklessness." *Id.*

In their motion for summary judgment, Defendants' only argument with respect to Plaintiffs' state law malicious prosecution claim is:

Plaintiff [sic] also asserts a state claim of malicious prosecution and has the burden of proving lack of probable cause and malice. *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich 365, 378 (1998). For the reasons cited above, in the absence of any evidence of these elements, defendants are entitled to governmental immunity under *Odom v. Wayne County*, 482 Mich. 459, 468, 480-82 (2008), and the State malicious prosecution claim must be dismissed.

(Defs.' Mot. S.J. at 29-30.)

Plaintiffs wholly fail to respond regarding this claim. However, as noted above, Defendants are obligated to explain why they are entitled to summary judgment and it is not for the Court to search the record and construct arguments. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See McPherson*, 125 F.3d at 995. Thus, Defendants' motion for summary judgment as to Plaintiff's common law

malicious prosecution claim is denied for failure to explain *why* they are entitled to summary judgment.

Alternatively, as explained above, the Court finds that there is a question of fact as to whether an accurate report might have resulted in a conclusion that there was insufficient evidence of probable cause, creating a fact issue on this claim, and Defendants' motion for summary judgment is denied for that reason as well.

### E. Intentional Infliction of Emotional Distress

Plaintiffs claim that Defendants intentionally inflicted emotional distress on them. (FAC Count III, ¶¶ 109-112, PgID 386.) An intentional infliction of emotional distress claim "requires a plaintiff to show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Jones v. Muskegon Cty.*, 625 F.3d 935, 948 (6th Cir. 2010) (quoting *Vredevelt v. GEO Group, Inc.*, 145 F. App'x 122, 135 (6th Cir. 2005) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985)).). "Such conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Id.* (quoting *Graham v. Ford*, 237 Mich. App. 670, 674 (1999) ). Indeed,

> [i]t is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive

damages for another tort.... The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id.* (internal citations omitted) (quoting *Graham*, 237 Mich. App. at 674-75).

In their motion, Defendants cursorily assert, without any further analysis or explanation, that:

> there is no evidence defendant officers engaged in extreme or outrageous conduct, intended to cause severe emotional distress, and actually caused emotional distress. Therefore, summary judgment is proper, the officers are entitled to governmental immunity under *Odom*, and this Court must dismiss Plaintiff's claim with prejudice.

(Defs.' Mot. S.J. at 31.)

In response, Plaintiffs simply assert that:

> Defendants Stawiasz, Pauch and Wilson's intentional concerted actions to fabricate evidence against Mr. Ricks, and to withhold exculpatory firearms examination results, was extreme and outrageous by any standard. Mr. Ricks was deprived of his freedom for 25 years based on the Defendants' wrongful conduct. Summary judgment on this claim must be denied.

(Pls.' Resp. to S.J. at 29-30.)

As explained above, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See McPherson*, 125 F.3d at 995. It is not for the court to search the record and construct arguments. Parties must do that for themselves. *Magnum Towing & Recovery*, 287 F. App'x at 449. Defendants' arguments are deemed waived and their motion for summary judgment on this claim is therefore denied. Further, construing

the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that Plaintiffs' allegations against Defendants could be construed as sufficiently "outrageous" to support a claim for intentional infliction of emotional distress.

###### F.    Punitive Damages

Defendants acknowledge that punitive damages are available in § 1983 cases for constitutional violations that involve reckless or callous indifference or evil motive or intent.  (Defs.' Mot. S.J. at 32, citing *Smith v. Wade*, 461 U.S. 30, 56 (1983).)   Defendants then summarily assert that they did not engage in any deliberate, malicious conduct, but instead acted in good faith, and thus Plaintiffs' claim for punitive damages should be dismissed.  (*Id.*)

In response, Plaintiffs assert "this case is a perfect example for when punitive damages are warranted under § 1983" because "[v]iewing the evidence in a light favorable to Plaintiffs, Defendants engaged in deliberate, malicious misconduct, and caused Mr. Ricks to be wrongfully imprisoned as a result for 25 years." (Pls.' Resp. to S.J. at 30.)

As explained above, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See McPherson*, 125 F.3d at 995.  It is not for the court to search the record and construct arguments. Parties must do that for themselves.  *Magnum Towing &*

*Recovery*, 287 F. App'x at 449. Defendants' argument with regard to Plaintiffs' punitive damages claim is deemed waived and their motion for summary judgment on this claim is denied.

### G. Statute of Limitations

Defendants argue that Plaintiffs' federal and state claims are time-barred by the two- or three-year statutes of limitations applicable to Plaintiffs' § 1983 claims, intentional infliction of emotional distress ("IIED") claim, and state law malicious prosecution claim because "[i]n 1992, there was no bar to Plaintiff bringing suit against the City of Detroit and its police officers." (Defs.' Mot. S.J. at pp. 34-35.) Plaintiffs respond that the § 1983 and state law malicious prosecution claims do not accrue until the sentence or conviction has been invalidated. (Pls.' Resp. to S.J. at p. 33, citing *Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994) and *Parisi v. Michigan Twps. Ass'n*, 123 Mich. App. 512, 519 (1983).)

The statute of limitations for constitutional fabrication of evidence and malicious prosecution claims accrue at the date of termination of proceedings in a criminal defendant's favor. *See Mills*, 869 F.3d at 484; *Heck*, 512 U.S. at 489-90. The same is true for the state law malicious prosecution claim. *See Parisi*, 123 Mich. App. at 519. Accordingly, these claims accrued on the date the Order of Nolle Prosequi was entered, June 1, 2017, and are not time-barred.

74

Plaintiffs' intentional infliction of emotional distress claim is different. Such a claim is governed by a three-year statute of limitations, Mich. Comp. Laws 600.5805(10), and the issue is whether this claim accrued at the time of the alleged conduct in 1992 or when the criminal proceedings terminated in his favor in 2017. Defendants cite to *Killian v. Fuller*, 162 Mich. App. 210 (1987) for the proposition that the claim accrues "at the time of misconduct, not at time of acquittal or release." (Defs.' Mot. S.J. at 35.) The court in *Killian* found that the statute of limitations for an IIED claim arising out of an arrest accrued on the date of the arrest and not the date that the Supreme Court denied the state leave to appeal from the Court of Appeals' decision reversing the criminal conviction on entrapment grounds. *Killian*, 162 Mich. App. at 216. Plaintiffs argue that *Killian* is "miscite[d]" because in that case the plaintiff pleaded guilty before a subsequent acquittal based on entrapment, and the court held that the guilty plea nullified any claim for malicious prosecution. (Pls.' Resp. to S.J. at 33.)

The Court finds the decision in *Peterson v. Heymes*, 277 F. Supp. 3d 913 (W.D. Mich. 2017), *rev'd in part on other grounds*, 931 F.3d 546 (6th Cir. 2019) instructive. The plaintiff in *Peterson* brought a wrongful conviction civil action against various law enforcement officers, prosecutors and municipalities, asserting claims for § 1983 violations and state law claims, including malicious prosecution and intentional infliction of emotional distress. The defendants argued that the

statute of limitations barred plaintiff's state law claims for intentional infliction of

emotional distress and civil conspiracy, and the Court explained that the "issue

requires the Court to determine whether the claims could have been brought when

the conduct occurred. If yes, then the claims are time barred. If, however,

[plaintiff's] conviction prevented him from bringing the claims, then the claims

would not be time barred." *Id.* at 930. The Court held that the IIED claim did not

accrue until the plaintiff's conviction was vacated, explaining:

> A claim accrues when the act upon which the claim is based was done,
> not when the damage occurs. Mich. Comp. Laws § 600.5827; *Nelson*,
> 564 N.W.2d at 487. A limitations period does not begin to run until the
> plaintiff "has a 'complete and present cause of action.'" *Bay Area
> Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of
> California, Inc.*, 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553
> (1997) (quoting *Rawlings v. Ray*, 312 U.S 96, 98, 61 S.Ct. 473, 85 L.Ed.
> 605 (1941)). "[A]s a general rule, a limitation period is tolled only by
> a substantive restriction on the plaintiff's ability to bring an action in a
> timely manner, not by mere procedural or technical irregularities whose
> correction is within the control of the plaintiff." *Turner v. Mercy Hosp.
> & Health Servs. of Detroit*, 210 Mich. App. 345, 533 N.W.2d 365, 368
> (1995) (citation omitted).

> MSP Defendants are not entitled to dismissal of the claims as time
> barred. Peterson explains that his intentional infliction of emotional
> distress claim "is a predicate for the civil conspiracy claim." (ECF No.
> 46 Pl. Resp. at 30 n.8 PageID.839.) *The conduct giving rise to
> Peterson's intentional infliction claim is the defendants' allegedly
> coercive interrogation and alleged fabrication of evidence. Peterson
> could not raise these claims before his conviction was vacated.* He had
> already filed motions in his criminal case challenging the voluntariness
> of his confession. That matter was resolved against him. To find that

his confession was voluntary, the court had to consider the conduct of MSP Defendants during the interrogation. Peterson would have been estopped from relitigating that issue in a civil case. Until the conviction was vacated, Peterson was operating under a substantive restriction that prevented him from litigating these two state torts.

*Id.* (emphasis added). Following *Peterson*, Plaintiffs' IIED claim did not accrue until Ricks' conviction was vacated on June 1, 2017, and thus Defendants are not entitled to dismissal of Plaintiffs' claims as time barred.

## H. Loss of Consortium Claims

Defendants argue that Plaintiffs Desire'a Ricks' and Akilah Cobb's claims for loss of society and companionship are dependent on Ricks' claims, and that because his claims fail, theirs do as well. (Defs.' Mot. S.J. at 35, citing *Hall v. Wooten*, 506 F.2d 564 (6th Cir. 1974); *Berger v. Weber*, 411 Mich. 1, 17 (1981).) Plaintiffs respond simply that because summary judgment of Ricks' claims is not warranted, his daughters' loss of consortium claims remain viable. (Pls.' Mot. S.J. at 34.)

Because the Court finds that Defendants are not entitled to summary judgment on Plaintiffs' claims, Plaintiffs' Desire'a Ricks and Akilah Cobb's claims for loss of society and companionship remain.

**IV.    CONCLUSION**

For all of the reasons stated above:

(1) Plaintiffs' motion for partial summary judgment (ECF No. 92) is

**DENIED**; and

(2) Defendants' motion for summary judgment (ECF No. 91) is **DENIED**.



**IT IS SO ORDERED.**

Dated:  April 2, 2020                                   s/Paul D. Borman
                                                        Paul D. Borman
                                                        United States District Judge